# 13-3619-cv

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

In Re: September 11 Litigation

On Appeal from the United States District Court
for the Southern District of New York, Nos. 21-MC-101 and 08-CIV-3719
Before the Honorable Alvin K. Hellerstein

**PLAINTIFFS-APPELLANTS' COMBINED PETITION FOR PANEL REHEARING AND REHEARING EN BANC**

MICHAEL D. GOTTESMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

SETH P. WAXMAN
HOWARD M. SHAPIRO
JONATHAN E. PAIKIN
DAVID M. LEHN
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

October 1, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

STATEMENT OF COUNSEL .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 3

I. DAMAGES MUST ACCOUNT FOR PLAINTIFFS' REBUILDING DUTY .......... 3

A. The Panel Erred In Excluding Plaintiffs' Rebuilding Duty From Market Value For Damages Purposes .......... 3

B. The Panel Decision Will Have Exceptionally Important Consequences For The New York Economy .......... 9

C. This Court Should Reverse The Denial Of Damages For Plaintiffs' Rebuilding Obligation, Or Certify The Question .......... 10

II. DAMAGES MUST ACCOUNT FOR THE WTC'S PUBLIC VALUE .......... 11

A. The Panel's Denial Of Rebuilding Costs Failed To Account For The WTC's Public Value .......... 11

B. The Panel Decision Will Have Exceptionally Important Consequences For The New York Economy And Public .......... 12

C. The Court Should Reverse The Denial Of Rebuilding Costs Based On The WTC's Public Value, Or Certify The Question .......... 13

III. DAMAGES AND INSURANCE PROCEEDS MUST BE STATED IN CONSTANT DOLLARS FOR THE OFFSET UNDER CPLR § 4545 .......... 14

A. The Panel Decision Is Unclear Whether Damages And Insurance Proceeds Must Be Stated In Constant Dollars Before The Offset .......... 14

B. The Court Should Clarify That Plaintiffs' Damages And Insurance Proceeds Must Be Stated In Constant Dollars Before The Offset, Or Certify The Question ....................................14

CONCLUSION ....................................................................................................15

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Beck Chevrolet Co. v. General Motors LLC*,
787 F.3d 663 (2d Cir. 2015) ....................2

*Fisher v. Qualico Contracting Co.*,
98 N.Y.2d 534 (2002) ....................5

*Franklin Corp. v. Prahler*,
932 N.Y.S.2d 610 (4th Dep't 2011) ....................6

*In re Kinsman Transit Co.*,
338 F.2d 708 (2d Cir. 1964) ....................1, 8, 9

*Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2d Cir. 1990) ....................1, 5

*Parkoff v. Stavsky*,
970 N.Y.S.2d 817 (2d Dep't 2013) ....................14

*People ex rel. United States Rubber Co. v. Knapp*,
232 N.Y. 153 (1921) ....................4

*Plouffe v. Rogers*,
534 N.Y.S.2d 731 (3d Dep't 1988) ....................6

*Port Authority Trans-Hudson Corp. v. Hudson Rapid Tubes Corp.*,
20 N.Y.2d 457 (1967) ....................12

*Poulos v. Badala*,
641 N.Y.S.2d 313 (1st Dep't 1996) ....................6

*Racich v. Celotex Corp.*,
887 F.2d 393 (2d Cir. 1989) ....................1, 4

*Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*,
13 N.Y.3d 398 (2009) ....................4

*Ross v. Louise Wise Services, Inc.*,
8 N.Y.3d 478 (2007) ....................4

*Schalscha v. Third Avenue Railroad Co.*,
43 N.Y.S. 251 (1st Dep't 1897)....................6

*Steitz v. Gifford*,
280 N.Y. 15 (1939)....................8

*United States v. 50 Acres of Land*,
469 U.S. 24 (1984)....................8

*United States v. 564.54 Acres of Land*,
441 U.S. 506 (1979)....................12

*United States v. Commodities Trading Corp.*,
339 U.S. 121 (1950)....................8

*Winkelmann v. Excelsior Insurance Co.*,
85 N.Y.2d 577 (1995)....................9, 12

**STATUTES**

N.Y. C.P.L.R. § 4545....................1, 2, 14, 15

Terrorism Risk Insurance Act, 15 U.S.C. § 6701 (2002)....................10

**LEGISLATIVE MATERIALS**

H. Rep. No. 107-300, pt. 1 (2001)....................10

**OTHER AUTHORITIES**

REBNY, *The Invisible Engine: The Economic Impact of New York City's Real Estate Industry* (Feb. 2014), https://www.rebny.com/content/dam/rebny/Documents/PDF/News/Research/Policy%20Reports/AKRF_Real_Estate_Economic_Impact_Jobs_Taxes.pdf....................9

## STATEMENT OF COUNSEL

Based on my professional judgment, I believe the panel decision excluding Plaintiffs' legal rebuilding duty from the market value when measuring tort damages conflicts with these decisions applying New York law: *Racich v. Celotex Corp.*, 887 F.2d 393, 396 (2d Cir. 1989); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990); *In re Kinsman Transit Co.*, 338 F.2d 708, 724-725 (2d Cir. 1964). Consideration by the full Court is necessary to secure and maintain uniformity of the Court's decisions. I believe the panel decision on this issue is exceptionally important because it could significantly affect New York's commercial real estate industry.

I believe the panel's conclusion that Plaintiffs are not entitled to replacement costs in order to restore the World Trade Center's lost public value is exceptionally important. By placing the loss of the public value on the lessee or the public rather than the tortfeasor, the panel decision will discourage private investment in public projects, to the public's detriment.

I believe the panel decision's lack of clarity on whether insurance proceeds and damages must be stated in constant dollars before the offset under CPLR § 4545 involves a question of exceptional importance for the operation of § 4545 and the measure of damages available to tort victims in New York.

## INTRODUCTION

Plaintiffs lease substantial portions of the World Trade Center from the Port Authority of New York and New Jersey, including the Main Site and 7 WTC. These ground leases expressly obligate Plaintiffs to reconstruct the buildings in the event of destruction. Plaintiffs claim that because of Defendants' negligence, the WTC was destroyed and the value of Plaintiffs' leaseholds was radically reduced during the 9/11 terrorist attacks. Departing from New York law, the panel ruled incorrectly that Plaintiffs could not recover rebuilding costs, whether as part of the measure of market value or as the means to restore lost public value. The panel, or the Court en banc, should reverse those conclusions or, as the dissent argues, certify either or both questions to the New York Court of Appeals. *Beck Chevrolet Co. v. General Motors LLC*, 787 F.3d 663, 682 (2d Cir. 2015) (certification standard).[1]

Additionally, the panel decision is unclear as to whether both the damages and the insurance proceeds received by Plaintiffs should be stated in constant dollars before the offset under CPLR § 4545. If the panel is not prepared to clarify that both must be stated in constant dollars, then the Court en banc should do so; alternatively, the question should be certified to the New York Court of Appeals.

[1] If the denial of rebuilding costs is reversed, the denial of retenanting and tenant improvement costs should also be reversed because that denial was derivative of the principal denial of rebuilding costs. Op. 39-40.

## ARGUMENT

### I. DAMAGES MUST ACCOUNT FOR PLAINTIFFS' REBUILDING DUTY

#### A. The Panel Erred In Excluding Plaintiffs' Rebuilding Duty From Market Value For Damages Purposes

The panel held that the "lesser of two" principle—that "the proper measure of damages for permanent injury to real property is the lesser of the decline in market value and the cost of restoration"—"limits Plaintiffs' recoverable damages to the diminution in market value of their leasehold interests and prevents them from recovering reconstruction costs." Op. 27-28. Even if that principle applied here, *but see infra* Part II, it would not preclude reconstruction costs because the market value of Plaintiffs' leaseholds after the attacks *must* account for their legal duty to rebuild. Apart from the perplexing questions raised by the prospect of valuing the leaseholds within the panel's framework—in which the integral contractual rebuilding duty is ignored and "the post-attack valuation … operate[s] under the hypothetical that the Leased Buildings were not rebuilt," *id*. at 48—the decision contravenes generally accepted principles of valuing leaseholds and every relevant principle of New York law.

1. The decision violates a fundamental rule of valuation. As the panel correctly recognized, the "market value" of a lease, under New York law and generally accepted valuation principles, is "the amount that a buyer would be willing to pay for the right to assume the lessee's rights and *obligations*." Op. 28-

29 (emphasis added); *id*. at 43; *People ex rel. U.S. Rubber Co. v. Knapp*, 232 N.Y. 153, 159 (1921); A957 (Defendants' expert). But the panel instructed that the "post-attack leasehold value should reflect only those continuing obligations that are *unrelated* to reconstruction, such as rental payments." Op. 48. No principle of valuation calls for reconstruction duties to be disregarded, and certainly no buyer would disregard them when deciding what to pay to assume the lease, since the buyer would become subject to them upon the assignment.

2. The decision flouts New York tort law's central damages principle: "Compensatory damages are intended to have the wrongdoer make the victim whole—to assure that the victim receive fair and just compensation commensurate with the injury sustained." *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007); *see also Racich v. Celotex Corp.*, 887 F.2d 393, 396 (2d Cir. 1989); N.Y. State Amicus Br. ("N.Y. Br.") 24. Because the leased buildings were destroyed, Plaintiffs were obligated by the leases to incur the cost of rebuilding, or—in the hypothetical assignment that defines market value—to pay a buyer an equivalent amount to assume the rebuilding duty. Unless the measure of tort damages against Defendants accounts for this cost, Plaintiffs will not be made whole.

3. The panel's instruction to assume that a buyer would ignore the rebuilding duty also subverts New York's respect for contracts, which has "special force in the context of real property transactions." *Riverside S. Planning Corp. v.*

*CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 403 (2009); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

4. The "lesser of two" principle complements rather than supersedes these foundational principles. Consistent with the tort principle that damages should make the victim whole, the "lesser of two" principle is merely a rule of mitigation that "ensures that a plaintiff receives 'no more than is reasonably necessary to remedy *fully* the injury while avoiding uneconomical efforts.'" *Fisher v. Qualico Contracting Co.*, 98 N.Y.2d 534, 539 (2002) (emphasis added). Consider a case (such as *Fisher*) in which property was destroyed and the victim had no legal duty to rebuild. If, before it was destroyed, the property could have been sold for $100,000, then that was its market value, and the defendant could compensate the plaintiff fully by paying $100,000 in damages, which the plaintiff could pocket or use to obtain a substitute property. Alternatively, the defendant could compensate the plaintiff fully by paying to rebuild the property, which the plaintiff could then keep or sell for $100,000. If it would cost more than $100,000 to rebuild, however, the "lesser of two" principle would rightly bar rebuilding costs because such damages would, as the panel noted, "force the defendant to bear a greater cost than is necessary to rectify the harm it caused." Op. 27.

In contrast, where the plaintiff is legally obligated to rebuild, the diminution in market value *absent rebuilding* is not simply a more cost-effective way to fully

compensate the plaintiff than rebuilding costs; it does not fully compensate for the loss. Such damages might compensate for the lost income and enable the plaintiff to obtain substitute property, *but the plaintiff would still be obligated to incur the cost of rebuilding*. Accordingly, New York courts have included in the measure of tort damages the cost of performing a contractual duty necessitated by the tortious conduct. *Poulos v. Badala*, 641 N.Y.S.2d 313, 314 (1st Dep't 1996) (plaintiff could pursue credit card finance charges for repair incurred because of contractor's negligence). In fact, New York courts have done so even where the property was leased and the resulting damages award exceeded the property's market value before the injury. *Plouffe v. Rogers*, 534 N.Y.S.2d 731, 733 (3d Dep't 1988) (plaintiff could seek damages exceeding destroyed car's value because of terms of a lease agreement). That New York courts would award only the lesser of replacement costs or lost market value even where the award did not make the plaintiff whole is contrary to New York law. *See Franklin Corp. v. Prahler*, 932 N.Y.S.2d 610, 616 (4th Dep't 2011) (plaintiff could seek damages for the cost of repairing classic car *and* diminution of car's value where neither alone would have made victim whole, because "under a general theory of damages, a plaintiff is entitled to be made whole"); *Schalscha v. Third Ave. R.R. Co.*, 43 N.Y.S. 251 (1st Dep't 1897).

5. Finally, the panel tried to justify its exception for rebuilding clauses

by equating lessees bound by such clauses with “landowner[s]” who are precluded by the “lesser of two” principle from recovering rebuilding costs in tort even though they “may have a strong economic interest in rebuilding.” Op. 32. That analogy ignores fundamental principles of property law. As the panel acknowledged, a lease “interest is distinct from the original fee simple interest and the lessor’s leased fee estate, and has its own market value—namely, the amount that a buyer would be willing to pay for the right to assume the lessee’s rights and obligations.” *Id*. at 28-29. Again, a fee owner can ordinarily be fully compensated for the loss by damages equal to the lesser of the cost of rebuilding or the lost market value without rebuilding, but the lessee who is legally bound to rebuild can be fully compensated *only if* the damages award includes the cost of rebuilding.

Relatedly, the panel asserted that awarding rebuilding costs here “would be inconsistent with the general principle that, when property is destroyed or condemned, a lessee is entitled to no more for that loss than the unencumbered value of the fee interest,” Op. 33, but that principle comes from condemnation cases and Plaintiffs are not aware of any New York decision applying it where the lessee was legally obligated to rebuild. Nor are Plaintiffs aware of authority stating that this principle trumps the fundamental tort principle that victims must be compensated fully. Moreover, the panel’s conclusion that damages with replacement costs would exceed the value of the unencumbered fee is neither self-

evidently correct nor grounded in any record evidence.

Contrary to the panel's suggestion, Op. 32-33, the decision in *United States v. 50 Acres of Land*, 469 U.S. 24 (1984), provides no guidance. First, the case did not involve New York law. Second, limitations on compensation in the eminent domain context—where courts are cautious about opening the public fisc, *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950) ("just" compensation accounts for both the "owner whose property is taken *and … the public that must pay the bill*" (emphasis added))—cannot be extended automatically to the tort context—where the tortfeasor takes the victim as is and bears the risk of uncertainty in the measure of damages, *Steitz v. Gifford*, 280 N.Y. 15, 20 (1939); *In re Kinsman Transit Co.*, 338 F.2d 708, 724-725 (2d Cir. 1964). Third, even *50 Acres* noted that in eminent domain cases, damages are not limited to market value when that is "too difficult to find" or would result in "manifest injustice." 469 U.S. at 29. And fourth, the duty in *50 Acres* was simply to replace the condemned trash facility, yet the plaintiff sought compensation for the full cost of replacing the facility with a "larger and better facility," despite having failed to meet its burden to establish "what would be a reasonable cost of a substitute facility," *id*. at 26, 28, 30-31, 34-35; *see* Op. 31-32; in contrast, in keeping with their duty to reconstruct the destroyed buildings as they were originally, A461-A462, Plaintiffs seek compensation for only that cost, though they spent more

money to build better replacement buildings, Dissent 2 n.1.

### B. The Panel Decision Will Have Exceptionally Important Consequences For The New York Economy

Because long-term ground leases, which are common in New York's commercial real estate market, generally entail rebuilding duties, A958 (Defendants' expert), the decision will likely have exceptionally important consequences for that market, which is an enormous part of the state's economy and tax base, especially in New York City. REBNY, *The Invisible Engine: The Economic Impact of New York City's Real Estate Industry* (Feb. 2014), https://www.rebny.com/content/dam/rebny/Documents/PDF/News/Research/Policy%20Reports/AKRF_Real_Estate_Economic_Impact_Jobs_Taxes.pdf. The decision shifts the risk of catastrophic property damage (whether from terrorist attack or otherwise) from tortfeasor, *see Kinsman*, 338 F.2d at 724-725, to victim. Although the precise consequences of the panel decision may not be fully known for some time, commercial developers may attempt to offset this increased risk by carrying much larger insurance coverage (perhaps even over-insuring), but that may not be possible. If tort victims cannot recover costs even when legally obligated to rebuild, insurers may not be able to subrogate such claims against tortfeasors, which may deter them from offering coverage for such loss. *Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 581 (1995). That could dry up financing because lenders require insurance to protect their collateral—the

buildings. If financing dries up, commercial real estate development would be seriously hampered. Even if insurers were to offer such coverage, they may escalate premiums radically, thereby reducing expected returns on commercial properties and again hampering development. This chain of events is precisely what occurred after the 9/11 attacks, until the federal government stepped in to subsidize terrorism insurance. Terrorism Risk Insurance Act § 101(a), 15 U.S.C. § 6701 note (2002); H. Rep. No. 107-300, pt. 1, at 13 (2001).

### C. This Court Should Reverse The Denial Of Damages For Plaintiffs' Rebuilding Obligation, Or Certify The Question

The panel or this Court en banc, therefore, should reverse the panel decision excluding the cost of performing Plaintiffs' rebuilding duty from the measure of damages. Alternatively, this Court should certify to the New York Court of Appeals the question of whether damages should account for the lessee's legal duty to rebuild tortiously destroyed property. Given that the panel decision conflicts with several core principles of New York law, it can only be the result of a policy judgment that tort damages for lessees subject to rebuilding clauses should be capped below actual damages. Such a policy judgment belongs to the State, especially given its exceptional importance to New York's real estate industry.[2]

---

[2] This question satisfies the other criteria for certification: its resolution would determine Plaintiffs' claim for reconstruction costs; and, as the panel tacitly acknowledged, Op. 28, the New York Court of Appeals has not squarely addressed it. Dissent 1-7, 15-17.

## II. DAMAGES MUST ACCOUNT FOR THE WTC'S PUBLIC VALUE

### A. The Panel's Denial Of Rebuilding Costs Failed To Account For The WTC's Public Value

Separately, Plaintiffs should be allowed to recover the cost of rebuilding to restore the WTC's public value, even if that cost exceeds the lost market value. Op. 37-38. There is no question that the WTC had value to the public beyond the leasehold's market value, that the public value was destroyed by the attacks, or that the lost public value could be restored only by rebuilding. Pls.' Br. 63-65; Reply Br. 15; N.Y. Br. 5-7, 17-23. Yet the panel denied Plaintiffs rebuilding damages because it considered Plaintiffs not to be the proper party to recover them, since they did not lease the WTC's public benefit portions and were not the "public's trustee." Op. 37.

The panel erroneously failed to recognize that Plaintiffs stand in the Port Authority's shoes and thus should be able to vindicate the public's interest. The contractual rebuilding duty not only "allocat[ed] the risk of loss" between the Port Authority and Plaintiffs, Op. 32, but also, as the State has explained, "served to protect the extensive public investment in the WTC, which was being entrusted to plaintiffs." N.Y. Br. 21. Accordingly, the Port Authority has opted not to seek damages from Defendants "so long as" Plaintiffs "continue[] to comply" with the rebuilding duty. A589. Just as the equitable doctrine of subrogation enables an insurer to stand in the shoes of its insured to recover for loss caused to its insured,

*Winkelmann*, 85 N.Y.2d at 581, in these circumstances equitable principles of New York law allow Plaintiffs to stand in the Port Authority's shoes and recover the cost of rebuilding in order to restore the WTC's public value, even if it exceeds the leasehold's lost market value. *See* Dissent 12-13.

The panel's reliance on *United States v. 564.54 Acres of Land*, 441 U.S. 506 (1979), Op. 37, was misplaced because that case did not involve New York law, arose in the distinct context of eminent domain, and did not involve a claim that the private party stood in the shoes of the public. And if eminent domain cases are relevant, then it is clearly appropriate under New York law to account for public value in measuring damages to a private party. *See Port Auth. Trans-Hudson Corp. v. Hudson Rapid Tubes Corp.*, 20 N.Y.2d 457, 465-466, 468-470 (1967) (awarding compensation in excess of market value because condemned property was "an essential part of an essential public facility"); N.Y. Br. 2 (disregarding "the public interest in rebuilding" when measuring Plaintiffs' damages is a "fundamental misapplication of New York law").

### B. The Panel Decision Will Have Exceptionally Important Consequences For The New York Economy And Public

The panel's erroneous decision to deny Plaintiffs recovery of rebuilding costs needed to restore the WTC's public value will have exceptionally important adverse consequences for New York's real estate market and for the public. When such property is destroyed, either the private lessee or the public—rather than the

tortfeasor—will bear the loss of public value: the private party will have to restore the lost public value by paying to rebuild; the public will have to pay to rebuild; or the public will have to forgo the public value of its destroyed property. *See* N.Y. Br. 4 (bar on recovery of public value could "shift the costs of rebuilding from allegedly negligent tortfeasors (and their insurers) to taxpayers"). The decision could in turn discourage public authorities and private parties from agreeing to lease private property, to the public's detriment, since many public projects are effectively implemented through such long-term leases. *See id*. at 3, 21.

### C. The Court Should Reverse The Denial Of Rebuilding Costs Based On The WTC's Public Value, Or Certify The Question

In light of the panel's errors, the panel or this Court en banc should reverse the denial of rebuilding costs to restore the WTC's public value. Alternatively, as the dissent argued, the Court should certify the question of whether Plaintiffs may recover rebuilding costs to restore the WTC's public value, because it calls for a policy judgment affecting private parties' willingness to undertake public projects, which is best made by the State. New York State has already told this Court that it has a "strong interest" in avoiding the misclassification of public property as private property for the purpose of tort damages. N.Y. Br. 23, 35.[3]

[3] This question satisfies the other criteria for certification: its resolution would determine Plaintiffs' claim for reconstruction costs; and the New York Court of Appeals has not squarely addressed it. Dissent 3, 7-17.

## III. DAMAGES AND INSURANCE PROCEEDS MUST BE STATED IN CONSTANT DOLLARS FOR THE OFFSET UNDER CPLR § 4545

### A. The Panel Decision Is Unclear Whether Damages And Insurance Proceeds Must Be Stated In Constant Dollars Before The Offset

Plaintiffs have measured and stated their damages in 2001 dollars because tort law requires damages to be assessed as of the date of the injury. *Parkoff v. Stavsky*, 970 N.Y.S.2d 817, 819 (2d Dep't 2013). Meanwhile, Plaintiffs received insurance proceeds for their losses in various years long after the attacks. The principle that tort damages must make victims whole—which CPLR § 4545 does not alter—requires that insurance proceeds and damages be stated in constant dollars before offset is performed, *e.g.*, by discounting the insurance proceeds back to their value as of the time of the injury before the offset is performed. Otherwise, the nominal value of the insurance proceeds received in later years would vastly overstate how much Plaintiffs received as compared to their 2001 damages, thereby causing Plaintiffs to be undercompensated for their injury. *See* Pls.' Br. 73 n.47. The panel did not clearly instruct the district court to state insurance proceeds and damages in constant dollars before performing the offset.

### B. The Court Should Clarify That Plaintiffs' Damages And Insurance Proceeds Must Be Stated In Constant Dollars Before The Offset, Or Certify The Question

Because stating insurance proceeds and damages in constant dollars before performing the offset could significantly affect the ultimate recovery, Plaintiffs ask

the panel to clarify its instructions. Alternatively, the panel or the Court en banc should certify the question of whether insurance proceeds and damages must be stated in constant dollars before the proceeds are used to offset damages under CPLR § 4545. This is a question of New York law calling for an exceptionally important policy judgment, as it affects the operation of CPLR § 4545 and determines the measure of recoverable damages where collateral payments are not received until years after the plaintiff suffered the injury.[4]

## CONCLUSION

The panel or this Court en banc should: (1) reverse on or certify the question of whether Plaintiffs' legal rebuilding duty should be included in the market value when measuring tort damages; (2) reverse on or certify the question of whether tort damages should include the cost of rebuilding to restore the WTC's lost public value; and (3) clarify or certify the question of whether insurance proceeds and damages should be stated in constant dollars before using the proceeds to offset damages under.

[4] This question satisfies the other criteria for certification: its resolution would determine the extent of Plaintiffs' ultimate recovery; and the New York Court of Appeals has not squarely addressed it.

Respectfully submitted.

/s/ Seth P. Waxman

SETH P. WAXMAN
HOWARD M. SHAPIRO
JONATHAN E. PAIKIN
DAVID M. LEHN
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MICHAEL D. GOTTESMAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

October 1, 2015

# ADDENDUM

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2014

(Argued: January 14, 2015 Decided: September 17, 2015)

Nos. 13-3619-cv, 13-3782-cv

---

In Re September 11 Litigation:

World Trade Center Properties LLC, 1 World Trade Center L.L.C., 3 World Trade Center L.L.C., 7 World Trade Center Company, L.P.

*Plaintiffs-Appellants*,

World Trade Farmers Market, Inc., Adem Arici, Lauren Peters, Omer Ipek, Mayore Estates, L.L.C., 80 Lafayette Associates, L.L.C., Serko & Simon, LLP, Certain Underwriters at Lloyd's Comprising Syndicates No. 33,1003,2003,1208,1243,0376, Great Lakes Reinsurance (UK) PLC, Barcley Dwyer Co., Inc., Karoon Capital Management, Inc., N.S. Windows, LLC, Tower Computer Services, Inc., Wall Street Realty Capital, Inc., MVN Associates, Inc., Marsha Van Name, Floyd Van Name, Daniel D'Aquila, Koudis International, Inc., American Alternative Insurance Corporation, The Princeton Excess & Surplus Lines Insurance Company, Certain Underwriters at Lloyd's London as Members of Syndicates Numbered 1212, 1241, 79, 506, and 2791, QBE International Insurance Ltd., Industrial Risk Insurers, Allianz Global Risks US Insurance Company, Allianz Insurance Company of Canada, Allianz Suisse Versicherungs-Gesellschaft, Allianz Versicherungs-Aktiengesellschaft, Assurances Generales De France, Assurances Generales de Franci Iart, Fireman's Fund Insurance Company, Woburn Insurance, Ltd., Greater New York

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page2 of 74

Mutual Insurance Company, Insurance Company of Greater New York, Munich-American Risk Partners, Underwriters at Lloyd's, subscribing to Syndicate No. 1225, as subrogees of Silverstein Properties, Inc., American Re-Insurance Company, AXA Art Insurance Corporation, AXA Cessions, AXA Corporate Solutions Assurance, AXA Corporate Solutions Services UK, Ltd., AXA Corporate Solutions Assurance Canadian Branch, AXA RE, AXA RE Madeira Branch, AXA Re Asia Pacific PTE. Ltd., AXA Reinsurance UK, PLC, AXA Verischerung AG, AXA Corporate Solutions, Compagnie Generale De Reassurance De Monte Carlo, SPS Reassurance, Aegis Insurance Services, Inc., Liberty Insurance Underwriters, Inc., National Union Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Certain Underwriters at Lloyds, (Syndicates 1225 and 1511), as subrogor of Consolidated Edison Company of New York, Inc., Muenchener Rueckversicherungs-Gesellschaft, Munich Reinsurance Company UK General Branch, AXA Corporate Solutions Assurance UK Branch, AXA Corporate Solutions Reinsurance Company, AXA Global Risks UK, Ltd., AXA RE Canadian Branch, CO2e.com, LLC, Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald L.P., Cantor Index Limited, Espeed, Inc., TradeSpark, L.P., eSpeed Government Securities, Inc., eSpeed Securities, Inc., Consolidated Edison Company of New York, Inc., 2 World Trade Center LLC, 4 World Trade Center LLC, Mary Bavis, Michael Keating, Gary Michael Low,

*Plaintiffs,*

-v.-

American Airlines, Inc., AMR Corporation, United Airlines, Inc., UAL Corporation, Massachusetts Port Authority, Continental Airlines, Inc., Colgan Air, Inc., US Airways Group, Inc., Huntleigh USA Corporation, Globe Aviation Services Corporation, Burns International Security Services Corporation, Burns International Services Corporation, Pinkerton's Inc., Securitas A.B., US Airways, Inc.,

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page3 of 74

*Defendants-Appellees*,

EMERY ROTH & PARTNERS L.L.C., EMERY ROTH & SONS, P.C., GLOBE AIRPORT SECURITY SERVICES, INC., HUNTLEIGH USA CORPORATION, LESLIE E. ROBERTSON ASSOCIATES, R.L.L.P., MINORU YAMASAKI ASSOCIATES, INC., SKILLING WARD MAGNUSSON BARKSHIRE INC., TISHMAN REALTY & CONSTRUCTION COMPANY, COLGAN AIRWAYS CORPORATION, SILVERSTEIN PROPERTIES, INC., 7 WORLD TRADE COMPANY, L.P., CITIGROUP INC., CITIGROUP GLOBAL MARKETS HOLDINGS INC., SALOMON SMITH BARNEY HOLDING, INC., SALOMON INC., SWANKE HAYDEN CONNELL ARCHITECTS, AMBASSADOR CONSTRUCTION CO., INC., COSENTINI ASSOCIATES INC., CANTOR SEINUK GROUP, P.C., H.O. PENN MACHINERY CO., INC., KABACK ENTERPRISES, PREFERRED UTILITIES MANUFACTURING CORP., ELECTRIC POWER SYSTEMS, INC., AMERICAN POWER TECHNOLOGIES, INC., G.C. ENGINEERING & ASSOCIATES, P.C., TISHMAN CONSTRUCTION CORPORATION, FIRECOM INC., GRACE CONSTRUCTION PRODUCTS, FIBERLOCK TECHNOLOGIES, INC., ROSEWACH TANK CO., INC., ALL FIRE SYSTEMS, INC., SYSKA HENNESSY GROUP, INC., SKIDMORE OWINGS AND MERRILL, L.L.P., FLACK & KURTZ, INC., ABCO PEERLESS SPRINKLER CORPORATION, AMEC, PLC, OFFICE OF IRWIN G. CANTOR, P.C., SECURITY SERVICES, INC., CENTRIFUGAL ASSOCIATES, INC., RIGGS BANK, N.A., A WHOLY OWNED SUBSIDIARY OF RIGGS NATIONAL CORPORATION, RIGGS NATIONAL CORPORATION, IRWIN G. CANTOR, P.C., JOHNSON CONTROLS WORLD SERVICES, INC., TISHMAN CONSTRUCTION CORPORATION OF NEW YORK, TISHMAN INTERIORS CORPORATION, DELTA AIRLINES, INC., MIDWAY AIRLINES CORPORATION, ICTS INTERNATIONAL, N.V., THE BOEING COMPANY,

*Defendants*.

---

Before: CABRANES, STRAUB, and LIVINGSTON, *Circuit Judges*.

Plaintiffs-Appellants ("Plaintiffs"), the lessees of 1, 2, 4, 5, and 7 World Trade Center, appeal from a series of orders of the United States District Court for the Southern District of New York (Hellerstein, *J.*), which culminated in the district court dismissing their case against Defendants-Appellees ("Defendants") for negligently maintaining airport security checkpoints on the morning of

September 11, 2001. In brief, the district court determined that Plaintiffs' insurance proceeds exceeded their maximum possible tort recovery and that, because New York Civil Practice Law and Rules ("CPLR") § 4545 requires offsetting collateral recoveries against corresponding tort damages, Plaintiffs could not receive a damages award even if they succeeded in proving liability. The district court also held that United Airlines, Inc. and United Continental Holdings, Inc. (collectively, "United"), owed no duty of care to the owner of 7 World Trade Center. We conclude that the district court correctly decided that Plaintiffs are entitled only to damages for the diminution in value of their leasehold interests, rather than the cost of rebuilding the leased buildings, and that they may not recover additional damages for retenanting the buildings, paying mortgage carrying costs, hiring attorneys for litigation against their insurers, insurance-claim preparation expenses, or lost tenant improvements. In addition, we agree with the district court that, pursuant to CPLR § 4545, Plaintiffs' insurance recoveries correspond to, and therefore must offset, damages for the diminution in value of their leasehold interests. Finally, we also agree that United owed no duty of care to the owner of 7 World Trade Center. Nonetheless, the district court erred in two respects. First, the court used an incorrect valuation methodology when calculating the value by which Plaintiffs' leasehold interests declined. Second, it wrongly awarded prejudgment interest at the federal funds rate, rather than New York's statutory prejudgment interest rate. On that issue, we also conclude that the district court should calculate interest on the final tort award. Accordingly, we **AFFIRM** the district court's order dismissing the claims brought by 7 World Trade Company against United. We also **AFFIRM** the district court's judgment insofar as it properly applied the "lesser of two principle" to limit Plaintiffs' damages, properly denied Plaintiffs' claims to consequential damages, and properly applied CPLR § 4545, but we **VACATE** the judgment in part and **REMAND** with instructions to assess the lost market value of Plaintiffs' leasehold interest and, if necessary, to recalculate the award of prejudgment interest in a manner consistent with this opinion.

Judge STRAUB concurs in part and dissents in part in a separate opinion.

FOR PLAINTIFFS-APPELLANTS: SETH P. WAXMAN, Randolph D. Moss, Joshua M. Salzman, Wilmer Cutler

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page5 of 74

Pickering Hale and Dorr LLP, Washington, D.C.

Richard A. Williamson, Jason T. Cohen, Megan P. Davis, Cathi Baglin, Flemming Zulack Williamson Zauderer LLP, New York, N.Y.

Michael Gottesman, Carleen M. Zubrzycki, Wilmer Cutler Pickering Hale and Dorr LLP, New York, N.Y.

FOR DEFENDANTS-APPELLEES: ROGER E. PODESTA, Maura K. Monaghan, Erica S. Weisgerber, Johanna N. Skrzypczyk, Debevoise & Plimpton LLP, New York, N.Y.

Desmond T. Barry Jr., Condon & Forsyth LLP, New York, N.Y.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case concerns the tremendous property damage caused by the terrorist attacks of September 11, 2001. Just months before the attacks, in April 2001, World Trade Center Properties LLC and affiliated companies ("WTCP")[1] obtained 99-year leases for 1, 2, 4, and 5 World Trade Center (the "Main Site Buildings") from the Port Authority of New York and New Jersey ("Port

[1] The affiliated companies that are also Appellants in this case are 1 World Trade Center L.L.C. and 3 World Trade Center L.L.C.

Authority"). A separate corporation, 7 World Trade Company, L.P. ("7WTCo."), held a long-term lease for 7 World Trade Center, which stood adjacent to the Main Site Buildings. The terrorist attacks destroyed all five of the buildings (collectively, the "Leased Buildings"), leaving WTCP and 7WTCo. ("Plaintiffs") saddled with significant losses. In March 2005, Plaintiffs brought suit in the United States District Court for the Southern District of New York (Hellerstein, *J.*) against a group of airlines and security contractors ("Defendants"),[2] seeking to recover for these losses. They alleged that, because the Defendants were negligent in overseeing airport security systems, the terrorists were able to hijack American Airlines Flight 11 and United Airlines Flight 175 and to fly those planes into the Twin Towers.

After a series of summary judgment decisions and a limited bench trial, Judge Hellerstein, who has presided over these matters with exemplary care and thoughtfulness, entered judgment for Defendants. The court decided that, if Plaintiffs could prove liability, they would be entitled to compensation for the

---

[2] Defendants are American Airlines, Inc.; AMR Corporation; United Airlines, Inc.; UAL Corporation; Massachusetts Port Authority; Continental Airlines, Inc.; Colgan Air, Inc.; US Airways Group, Inc.; Huntleigh USA Corporation; Globe Aviation Services Corporation; Burns International Security Services Corporation; Burn International Services Corporation; Pinkerton's Inc.; Securitas A.B.; and US Airways, Inc.

amount of value that their leasehold interests lost due to the attacks, but not for reconstruction costs or other claimed consequential damages related to the cost of retenanting the Leased Buildings, replacing tenant property, hiring attorneys, and paying mortgage carrying costs. The court then found that the value of WTCP's leasehold interests declined by, at most, $2.805 billion, while the value of 7WTCo's interests fell by $737 million. Both Plaintiffs, however, received insurance payments for their property damage that *exceeded* those figures and compensated Plaintiffs for the same economic loss as the potential tort award. Because New York Civil Practice Law and Rules § 4545 ("CPLR") requires courts to reduce damage awards to reflect corresponding insurance payments, the district court concluded that, even if Plaintiffs could prove liability, they could not receive a damages award, and that judgment for Defendants was therefore appropriate. Separately, the district court dismissed 7WTCo.'s claims against United Airlines, Inc. and its parent company, United Continental Holdings, Inc. (collectively, "United"), on the grounds that the airline had no connection to American Airlines Flight 11, which destroyed 7 World Trade Center.

On appeal, we agree with the district court's conclusion that Plaintiffs are entitled to compensation only for the amount of value that their leasehold

interests lost due to the terrorist attacks, that they cannot recover their claimed consequential damages, and that, pursuant to CPLR § 4545, their insurance recoveries correspond to, and offset, their potential tort award. We also agree that United had no duty to supervise the security checkpoints or detect the hijackers who boarded American Airlines Flight 11.

However, the district court erred in two respects. First, the court used an incorrect methodology when calculating the value by which Plaintiffs' leasehold interests declined. Second, it wrongly decided that prejudgment interest accrues at the federal funds rate on the diminution in value of Plaintiffs' leasehold estates. Instead, the court should have calculated prejudgment interest using New York's statutory prejudgment interest rate, and assessed that interest based on the *final* damages award. We therefore vacate in part the district court's entry of judgment for Defendants — insofar as it miscalculated the diminution in the value of Plaintiffs' leasehold interest and improperly assessed the prejudgment interest by using the federal funds rate — and remand with instructions as to further proceedings. On remand, the district court should reexamine the diminution in value of Plaintiffs' leasehold interests in accordance with the guidance provided in this opinion and, if appropriate, calculate interest based on

any resulting award (after accounting for the offset of Plaintiffs' insurance recoveries) using New York's statutory prejudgment interest rate.

## BACKGROUND

### A. Factual Background

#### 1. The World Trade Center Leases

In 1962, New York and New Jersey enacted legislation authorizing the Port Authority[3] to construct an "interurban railway" between the two States and a "facility of commerce" to accommodate "the exchange and buying, selling and transportation of commodities and other property in world trade and commerce." N.Y. Unconsol. Law § 6601(6)-(8); *see* N.J. Stat. § 32:1-35.50-32:1-35.68. From that legislative command sprung the World Trade Center complex, which upon completion in 1973 "consisted of a 16-acre public site with a street

---

[3] The Port Authority is a joint venture between the States of New York and New Jersey that was established by an interstate compact in 1921 and authorized by Congress under Article I, Section 10 of the United States Constitution. Jointly controlled by the governors of New York and New Jersey, the Port Authority manages significant portions of the regional transportation infrastructure within the two States, including bridges, tunnels, airports, and seaports. *See Governance*, Port Authority of New York and New Jersey, http://www.panynj.gov/corporate-information/governance.html (last visited July 15, 2015); *see also* Grover Starling, Managing the Public Sector 123 (2010); Caroline N. Broun, Michael L. Buenger, Michael H. McCabe, Richard L. Masters, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide 368 (2006).

level plaza, a street level and underground shopping mall, a transportation terminal for the New York-New Jersey PATH trains, a subway hub offering direct access to several [New York City] subway lines, and six [office] buildings, including the 'Twin Towers' and the first hotel to open in downtown Manhattan since 1836." J.A. 548. Five of those buildings — 1, 2, 4, 5, and 7 World Trade Center — provided approximately 12 million square feet of office space. In all, the complex reshaped the City's skyline and the economy of lower Manhattan.

After construction, the Port Authority acted as a landlord for the office space in 1, 2, 4, and 5 World Trade Center, the Main Site Buildings. During that time, it studied the possibility of transferring its role as landlord to a private entity and investigated "comparisons of the World Trade Center with similar private sector operations." J.A. 377. On January 25, 1996, the Port Authority went further, hiring J.P. Morgan & Co., Cushman & Wakefield, and Douglas Elliman Realty Investors to test the "market reaction" to "three specific options for maximizing the value of the World Trade Center to the Port Authority and to the people of the region": selling the property, leasing the property, or relinquishing operational control of the property through an asset management

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page11 of 74

agreement. J.A. 377. Those tests convinced the Port Authority to lease portions of the Main Site Buildings to private operators.

The Port Authority began the leasing process by sending a worldwide "request for interest" and then asking 30 of the responding companies for preliminary proposals. The requests generated eight submissions, which the Port Authority narrowed to a "short-list" of four finalists: Boston Properties, Inc.; Brookfield Financial Properties; Silverstein Properties, Inc. (later, "WTCP") and Westfield America, Inc.; and Vornado Realty Trust. J.A. 377. These entities were allowed to perform due diligence before submitting bids.

On February 22, 2001, the Port Authority entered into an exclusive negotiating period with Vornado Realty Trust for a 99-year lease on all of the Main Site Buildings. "The value to the Port Authority of Vornado Realty Trust's proposed net lease transaction, on a present value basis," was estimated by the Port Authority to be approximately $3.253 billion. J.A. 377. When the negotiations fell apart, the Port Authority turned to the second-highest bidder, WTCP. The parties signed an "Agreement to Enter Lease" on April 26, 2001 and, on July 16, 2001, WTCP signed 99-year leases for the Main Site Buildings.

Under the terms of those leases, WTCP obtained the right to manage and sublease approximately ten million square feet of office space, much of which was already occupied by tenants.[4] In exchange, it agreed to make an upfront payment of $491.3 million and to pay three forms of rent: basic rent, which increases gradually over the 99-year lease term; additional, fixed rent for the first 30 years of the lease; and a percentage of WTCP's gross revenue from operating the premises. It also undertook non-rent obligations, the most significant of which was the promise that, in the event that the Main Site Buildings were destroyed or damaged, WTCP would "rebuild, restore, repair and replace [them] . . . to the extent feasible, prudent and commercially reasonable." J.A. 461. In addition, it promised to pay for maintenance, operational costs, and tax equivalents, and to purchase sizable insurance policies. WTCP announced the acquisition in a brochure to investors, identifying the present value of the overall "purchase price" to be $2.844 billion.[5] J.A. 524.

---

[4] WTCP's partner, Westfield America, Inc., took control of the retail mall at the World Trade Center complex. Because Westfield America is not an appellant, this opinion will not address portions of the lease agreement that pertain to the retail mall.

[5] The brochure also notes that the lease for the retail mall cost $395 million, amounting to an overall purchase price of $3.239 billion. This figure is similar to the Port Authority's evaluation of the proposal, which valued WTCP and Westfield America's bid at $3.211 billion in present-value terms.

Unlike the Main Site Buildings, 7 World Trade Center was privately managed and operated even before its construction. In 1980, the Port Authority hired 7WTCo. to design, erect, and equip an office building adjacent to the Main Site of the World Trade Center complex. 7WTCo. completed the project, which came to be known as 7 World Trade Center, in 1987, at which point it signed a 99-year lease with the Port Authority to manage the property. Like WTCP, 7WTCo. agreed to pay rent, tax equivalents, and operational expenses, to purchase insurance, and to "rebuild, restore, repair and replace" the building "at its sole cost and expense" in the event of its destruction. J.A. 943-49.

**2. The Destruction of the Leased Buildings**

On the morning of September 11, 2001, Mohamed Atta, "[t]he operational leader of the 9/11 conspiracy," J.A. 373, and an accomplice passed through airport security in Portland, Maine, and took US Airways/Colgan Flight 5930 to Boston Logan International Airport. J.A. 359. Upon arriving at Logan, they joined three co-conspirators and passed through a security checkpoint run by American Airlines before boarding American Airlines Flight 11. Five other terrorists began their attack in Boston, entering the boarding area through a United Airlines security checkpoint at Logan Airport and then boarding United

Airlines Flight 175. The first group hijacked Flight 11 and crashed the plane into 1 World Trade Center. Soon after, the second group used Flight 175 to destroy 2 World Trade Center. By the late afternoon, falling debris and fires had destroyed the other Main Site Buildings and 7 World Trade Center, and had damaged large portions of lower Manhattan.

The September 11th attacks were a financial catastrophe for Plaintiffs. According to WTCP and 7WTCo., their leases required them to continue paying rent to the Port Authority notwithstanding the lack of income from tenants, and to reconstruct the Leased Buildings. Plaintiffs also claim that the attacks forced them to bear additional expenses, including the cost of pursuing insurance claims, replacing tenant improvements, retenanting the buildings, and paying mortgage carrying costs.

To guard against these types of losses, WTCP and 7WTCo. had obtained extensive insurance policies on their leasehold interests, which insured them for damage caused by terrorist attacks. WTCP's policy involved over two dozen insurers and insured the company "for business interruption (lost [rental payments]) and the replacement costs of the buildings if damaged or destroyed, up to $3.5468 billion per [covered] occurrence." S.P.A. 79. 7WTCo. obtained a

similar, but smaller, policy from Industrial Risk Insurers ("IRI"), which covered business interruption losses and rebuilding costs up to $860 million per covered occurrence. S.P.A. 79. The replacement cost coverage was designed to protect Plaintiffs against physical damage to their property — and did not require that they actually repair or rebuild the Leased Buildings in order to receive insurance payments — while the business interruption coverage was intended to indemnify Plaintiffs for any loss of income that occurred while the leased buildings were damaged or destroyed.

Both Plaintiffs filed insurance claims shortly after the September 11th attacks. WTCP submitted proofs of loss seeking $8.531 billion from its insurers. These proofs of loss allocated roughly $7.183 billion to replacement costs for the Main Site Buildings and $1.348 billion to business interruption losses. WTCP also identified damages "other than destruction of real property and business interruption," but never quantified those claims. J.A. 1010. While three insurers paid their portion of the claims promptly, the rest argued that the September 11th attacks were one "occurrence" under their policies, so WTCP's recovery

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page16 of 74

could not exceed $3.5468 billion.[6] WTCP sued the recalcitrant insurers in the United States District Court for the Southern District of New York, *see SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107 (2d Cir. 2006), and the parties ultimately settled, with the insurers agreeing to pay WTCP approximately $4.1 billion. The settlement involved a general release of all of WTCP's claims against the insurers and did not allocate the settlement proceeds among WTCP's claimed losses.

Separately, 7WTCo. submitted proofs of loss seeking $1.497 billion from IRI, with roughly $1.053 billion allocated to replacement costs, $442 million for business interruption, and $2 million for personal property. Like WTCP's claims, 7WTCo.'s submission exceeded its $860 million per-occurrence policy limit, and IRI initially balked at paying the entire claim. 7WTCo. filed suit, and IRI eventually agreed to pay approximately $831 million in exchange for a general release of all claims. Once again, the settlement did not allocate the proceeds of the payment between 7WTCo.'s claimed losses.

[6] Even if the attacks constituted two "occurrences," WTCP's replacement cost and business interruption claims exceeded its maximum possible insurance recovery, which is known as a "policy limits loss." J.A. 987.

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page17 of 74

**B. Procedural History**

In 2004, Plaintiffs sued a group of airlines and airport security contractors in the district court, claiming that their negligent maintenance of airport security checkpoints in Boston and Portland allowed the terrorists to board and hijack the planes that destroyed the Leased Buildings. Plaintiffs' claims arise under the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230 (codified as amended at 49 U.S.C. § 40101), which creates an exclusive "Federal cause of action for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 185, on September 11, 2001." ATSSSA § 408(b)(1). Under the Act, "[t]he substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." *Id.* § 408(b)(2). The parties agree that, in this case, the substantive law is derived from the law of New York. Appellants' Br. at 41; Appellees' Br. at 82.

After extensive discovery, Defendants moved for summary judgment on WTCP's claims. They focused on damages, rather than the merits of the negligence claim, arguing that: (1) WTCP is entitled to compensation for the

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page18 of 74

amount of value that their leasehold interests lost due to the attacks, and not for replacement costs or other consequential damages; (2) the diminution in the fair market value of the Main Site Leases was $2.805 billion — the present value of the rent that WTCP agreed to pay for those leases; and (3) that, pursuant to CPLR § 4545, any tort award WTCP could receive must be reduced by the amount of its insurance recovery.

WTCP countered that using the lost market value of its leasehold interests to calculate damages results in insufficient compensation, that the decline in the value of its leaseholds exceeded $2.805 billion, and that CPLR § 4545 does not require an offset for its insurance recoveries. In support, it offered declarations from expert witnesses. Sheldon Gottlieb, an expert in real estate appraisal, testified that the market value of WTCP's leaseholds does not reflect the immense public benefits that the World Trade Center complex provided. He added that, in any event, $2.805 billion is simply the amount of rent that WTCP agreed to pay, which is not equivalent to the decline in the value of the WTCP's leasehold interests because it ignores the profits WTCP expected to earn, the value of non-rent obligations that WTCP assumed, and the post-attack costs that WTCP was forced to bear, which resulted in the leases having a *negative* value

after September 11, 2001. Professor Kerry D. Vandell, an expert in real estate finance, echoed Gottlieb's opinion that $2.805 billion is the amount of rent that WTCP agreed to pay, not the amount by which the value of its leasehold interest declined. Vandell explained that ascertaining the correct change in value requires comparing the value of WTCP's leasehold interests before and after the attacks.

On December 11, 2008, the district court granted Defendants' motion in part and denied it in part. The court noted that New York follows the "lesser of two" rule, under which "a plaintiff whose property has been injured may recover the lesser of the diminution of the property's market value or its replacement cost." S.P.A. 10. It then concluded that the diminution in market value is the appropriate measure of compensation, rejecting the arguments that, because of the public purpose of the Main Site Buildings and WTCP's contractual obligation to rebuild, replacement costs are the proper measure of damages. The court, however, refused to conclude that the value of WTCP's leasehold interest declined by $2.805 billion. Although WTCP agreed to pay that sum to obtain the leases in April 2001, "market values can fluctuate rapidly" and "the value of property privately owned and managed by an experienced real estate developer

may enjoy a different market value than property owned and managed by a governmental bureaucracy." S.P.A. 21. As a result, the court temporarily denied summary judgment to provide WTCP an opportunity to show that the value of the Main Site Leases changed between April and September 2001. The court also concluded that there was insufficient evidence to decide the CPLR § 4545 issue, and therefore denied summary judgment without prejudice.

In response to the summary judgment decision, WTCP submitted an additional declaration from Professor Vandell. In this declaration, Vandell reiterated that the diminution in the value of WTCP's leasehold should be calculated by measuring the "difference between the fair market value of [its] interests immediately before and immediately after" September 11, 2001. J.A. 632. Fair market value is the amount "an investor or third party would be willing to pay for an assignment of" the Main Site Leases, and can be calculated by comparing the present value of the expected revenues and expenses associated with owning those leases. *Id.* Because expected costs can equal or exceed expected revenues, the value of a leasehold interest can be zero or negative. Vandell then evaluated the diminution in market value of WTCP's leasehold interest, concluding that the leasehold had a market value of $1.459

billion immediately before the attacks and *negative* $5.333 billion immediately afterwards. His calculations included WTCP's expected profits from operating the Main Site Buildings and the costs associated with reconstruction. In all, the diminution in market value added up to $6.792 billion.

The district court considered these arguments and, on April 30, 2009, rejected them. The court characterized WTCP's submission as an attempt to correct perceived errors in the original summary judgment decision and viewed the argument that the Main Site Leases had negative value after the attacks as a new attempt to recover reconstruction costs. It therefore decided that any recovery by WTCP against Defendants for the Main Site Leases "shall not exceed $2.805 billion." S.P.A. 30. Several months later, on September 30, 2009, the district court also granted Defendants summary judgment on WTCP's claims for the cost of retenanting the Main Site Buildings, replacing tenant improvements, and paying attorneys' fees during the insurance litigation, thereby capping WTCP's possible damages at $2.805 billion.

The 7WTCo. litigation followed a similar path. First, United moved for summary judgment on the grounds that it was not responsible for the security checkpoints that the terrorists used before hijacking American Airlines Flight 11,

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page22 of 74

which destroyed 7WTCo. The remaining Defendants then filed a separate summary judgment motion, arguing that 7WTCo. can recover only the diminution in value of its leasehold interest and that, pursuant to CPLR § 4545, its damages award must be reduced by the amount of its insurance recovery.

On November 21, 2012, the district court granted summary judgment to United, concluding that there was no evidence that it had a "connection to Flight 11 or its hijackers," S.P.A. 56, and therefore that it "did not owe 7WTCo. a duty of care," S.P.A. 58. The court resolved the second summary judgment motion in an order issued on December 5, 2012. As in WTCP's case, the district court concluded that 7WTCo. is entitled to compensation for the amount of value that their leasehold interests lost due to the attacks, but not for reconstruction costs or other claimed consequential damages. For 7WTCo., that diminution in value was, at most, $737 million, a figure that the district court drew from Vandell's assessment of the pre-attack value of 7WTCo.'s leasehold interest.[7] Also as in WTCP's case, the district court rejected 7WTCo.'s claims to recover for the cost of retenanting the building, lost tenant improvements, attorneys' fees incurred

---

[7] Vandell's report for 7WTCo. argued that the pre-attack value of its leasehold interest was $737 million and that the post-attack value was *negative* $222 million. Once again, the post-attack leasehold valuation included the cost of reconstructing the destroyed building.

during litigation with IRI, and mortgage carrying costs.[8] Finally, the district court denied summary judgment to the Defendants on the argument that 7WTCo.'s potential tort award must be reduced by its insurance recovery.

After establishing WTCP's and 7WTCo.'s maximum recoverable damages, the district court chose to conduct a bench trial to determine whether, under CPLR § 4545, any tort award Plaintiffs receive would need to be reduced by the value of their insurance recoveries. Over the course of a five-day trial held in July 2013, the district court heard testimony about the proper way to allocate the insurance recoveries between the different types of insurance claims Plaintiffs submitted, and heard the opinions of two economists — Professor Steven Shavell for the Plaintiffs and Professor Daniel Fischel for the Defendants — about whether a potential tort award would compensate Plaintiffs for the same type of losses that their insurance recoveries remedied.

In an order issued from the bench and then supplemented by a written opinion, the district court ruled for the Defendants. It concluded that, after accounting for fees and insurance premiums, WTCP recovered $4.044 billion from its insurers and 7WTCo. recovered $829 million. These payments

---

[8] The district court granted 7WTCo.'s claims to recover lost personal property, but the company settled these claims with Defendants before this appeal.

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page24 of 74

compensated Plaintiffs for the cost of replacing the leased buildings and "for business interruption, i.e., the cost of rental payments that sub-lessees . . . failed to pay . . . as a result of the buildings' destruction." S.P.A. 81. The court then determined that these categories of insurance recovery "correspond[] completely to Plaintiffs' potential tort recoveries related to the lost value of their leaseholds, and that the insurance recoveries should be set off against such potential tort recoveries, reducing them to zero." S.P.A. 86. Accordingly, the district court entered judgment for Defendants.

## DISCUSSION

On appeal, Plaintiffs contend that the district court erred at each step in the series of orders that culminated in its decision to dismiss their claims. We review the district court's grants of summary judgment and its legal conclusions *de novo*, construing all facts in favor of the nonmoving party. *Shakhnes v. Berlin*, 689 F.3d 244, 250 (2d Cir. 2012). As for the bench trial, we review the district court's findings of facts for clear error, and its conclusions of law *de novo*. *CARCO GROUP, Inc. v. Maconachy*, 718 F.3d 72, 79 (2d Cir. 2013) (per curiam).

**A. Damages**

Our analysis begins with the calculation of Plaintiffs' maximum recoverable damages. After a series of summary judgment decisions, the district court determined that, if WTCP and 7WTCo. could prove that Defendants are liable for the destruction of the World Trade Center Complex, the companies could recover, at most, $2.805 billion and $737 million, respectively. In arriving at this decision, the district court concluded that Plaintiffs are entitled only to the amount of value that their leasehold interests lost due to the attacks, not reconstruction costs, and that Plaintiffs cannot recover for the costs associated with retenanting the Leased Buildings, lost tenant improvements, paying mortgage carrying costs, or hiring attorneys for the litigation against the insurers. We agree with these conclusions, and therefore affirm in substantial part the orders in which the district court announced them.[9] The district court, however, relied on an incorrect method of measuring the market value of leasehold estates. Accordingly, we vacate the portions of the August 30, 2009 and December 5, 2012 orders establishing the diminution in value of Plaintiffs' leasehold interests, and

---

[9] The district court limited Plaintiffs' recoveries to diminution in market value in its December 11, 2008, and December 5, 2012 orders. It denied their claims for tenanting, mortgage carrying costs, and attorneys' fees in orders issued on September 30, 2009, and December 5, 2012.

remand to the district court to reassess these calculations in light of the guidance in this opinion.

**1. Reconstruction Costs**

Under New York law, which provides the substantive law governing Plaintiffs' ATSSSA claims, "an award of damages to a person injured by the negligence of another" is designed "to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred." *McDougald v. Garber*, 73 N.Y.2d 246, 253-54 (1989). When negligence results in the permanent destruction of real property, damages can "place the wronged victim in the same position as it was prior to the wrongdoing," 36 N.Y. Jur. 2d *Damages* § 6, in one of two ways. One possibility is to award the plaintiff "the difference between the value of the land before the injury and its value after the injury . . . sometimes called the 'diminution-in-value rule.'" 36 N.Y. Jur. 2d *Damages* § 75; *see also Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 539 (2002). The other is to award "the cost of restoration," *Scribner v. Summers*, 138 F.3d 471, 472 (2d Cir. 1998) (per curiam), plus the "reasonable worth" of the property's use while the plaintiff "is deprived of" the property, 36 N.Y. Jur. 2d *Damages* § 113.

While these two measures of damages — the decline in market value and the cost of restoration — compensate a plaintiff for the same injury, they can produce awards of different sizes. As a result, the New York Court of Appeals has instructed that, in general, "the proper measure of damages for permanent injury to real property is the lesser of the decline in market value and the cost of restoration." *Jenkins v. Etlinger*, 55 N.Y.2d 35, 39 (1982); *see also Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892). This "lesser of two" principle reflects the judgment that, in most cases, both measures of damages are capable of "affording full compensation" for lost property — as the Court of Appeals put it, they are "two sides of the same coin." *Fisher*, 98 N.Y.2d at 540. Quite simply, when property is damaged, the value of owning that property falls. The value can be returned to the owner by paying an amount of money equivalent to the loss in value or by providing funds to restore the property to its original state. *Id.*; *see also* Dobbs, Law of Remedies § 5.2(3) at 722 (2d ed. 1993) ("The reason for using diminished value as a ceiling on repair costs is clear; diminished value represents the full amount of economic loss of a landowner . . . ."). Allowing the plaintiff to recover the *higher* measure of damages, then, would force the defendant to bear a greater cost than is necessary to rectify the harm it caused.

In its December 11, 2008 and December 5, 2012 orders, the district court concluded that this "lesser of two" principle limits Plaintiffs' recoverable damages to the diminution in market value of their leasehold interests and prevents them from recovering reconstruction costs. We agree.[10]

New York courts have applied the "lesser of two" principle across a broad spectrum of possessory interests, including fee simple interests in both residential and commercial property. *See, e.g.*, *Fisher*, 98 N.Y.2d at 536 (residential property); *Hartshorn*, 135 N.Y. at 122 (farm); *Prashant Enters. Inc. v. New York*, 650 N.Y.S.2d 473, 476 (3d Dep't 1996) (motel); *see also Scribner*, 138 F.3d at 472 (family business and rental property). The compensatory principles that animate these decisions apply no differently in the context of leasehold interests like those of the Plaintiffs in the Leased Buildings. A commercial lease entitles the lessee to use all or part of a property for a specified period of time, in exchange for rent and other consideration. This interest is distinct from the original fee simple interest and the lessor's leased fee estate, and has its own

[10] Plaintiffs characterize the district court's decision as concluding that Defendants' purported negligence was not the proximate cause of Plaintiffs' obligation to rebuild. We need not, and do not, address whether this is a proper characterization of the district court's decision. Instead, our conclusion that the "lesser of two" rule limits Plaintiffs' damages to the diminution in market value of their leasehold interests renders the proximate cause issue irrelevant to resolving this case.

market value — namely, the amount that a buyer would be willing to pay for the right to assume the lessee's rights and obligations. *See Great Atl. & Pac. Tea Co. v. New York*, 22 N.Y.2d 75, 84 (1968); Appraisal Inst., *The Appraisal of Real Estate* 83 (12th ed. 2001). If a portion of the property covered by the leasehold interest is destroyed or damaged, the value of the leasehold interest falls because the bundle of rights to which the owner of that interest is entitled becomes less valuable. *See, e.g.*, James R. MacCrate, *The Valuation of Leasehold Interests*, Real Estate Appraisal and Valuation Issues (June 2, 2010), https://realestatevaluation.wordpress.com/2010/06/02/the-valuation-of-leasehold-interests/; Jeffrey D. Fisher & Robert S. Martin, *Income Property Appraisal* 189 (1991). An award can therefore place the lessee in the "same position as it was prior to the wrongdoing," 36 N.Y. Jur. 2d *Damages* § 6, either by providing the monetary equivalent of the lost value or by presenting the plaintiff with sufficient funds to repair the damages and weather the reconstruction period, thereby restoring the original value of the rights under the lease. *Cf. Great Atl. & Pac. Tea Co.*, 22 N.Y.2d at 84 ("The damages to which a lessee is entitled are generally the value of the leasehold.").

Of course, leasehold interests involve a different set of rights and obligations than fee simple ownership. But these are differences of degree, not of kind. For instance, a lessee, unlike a fee simple owner, often has an obligation to pay rent that continues even after the property covered by the lease is destroyed. In fact, both WTCP and 7WTCo.'s leases contain such a covenant. This continuing obligation, however, means only that the value of the leasehold interest *after* the destructive event must take into account the lessee's obligation to make future rental payments. Professor Vandell, Plaintiffs' expert on damages, agrees, and attributes a negative market value to Plaintiffs' leases after the attacks to account for the obligation to pay rent. This method of calculating diminution in market value differs from the calculation that a court would perform in the context of fee simple ownership, but that does not alter the principle that diminution in value, properly ascertained, can adequately compensate a commercial lessee.

WTCP and 7WTCo. counter that their leases also differ from fee simple ownership because they are obligated to reconstruct the Leased Buildings.[11] That

[11] Defendants challenge Plaintiffs' characterization of the requirement to rebuild the Leased Buildings. Appellees' Br. at 55-62. Their argument centers on the clause in the lease that requires Plaintiffs to "rebuild, restore, repair, and replace" the Buildings, but only "to the extent feasible, prudent and commercially reasonable." *Id.* at 56. Because

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page31 of 74

obligation does not, however, entitle them to the reconstruction cost measure of damages. Although property owners are often "not legally obligated" to reconstruct damaged property, "economic circumstances often force them to do so"; "[w]hen a home is condemned, for example, its owner must find another place to live." *United States v. 50 Acres of Land*, 469 U.S. 24, 34 (1984). Nonetheless, New York courts have not considered a plaintiff's decision to repair property, standing alone, to be a sufficient justification for awarding replacement costs that exceed diminution in market value. *See, e.g.*, *Fisher*, 98 N.Y.2d at 534-40 (limiting plaintiffs' recovery to diminution in market value notwithstanding fact that plaintiff had already rebuilt property); *cf. Application of City of N.Y.*, 680 N.Y.S.2d 533, 535-36 (1st Dep't 1998) (noting that, in the takings context, replacing condemned property is not sufficient to justify compensation in excess of market value). Compensatory damages, after all, "serve to make good, so far as it is possible to do so in dollars and cents, the harm done by a wrongdoer," which is, at most, what the plaintiff *lost*, not what the plaintiff later purchased, even if they were required to do so. *Lopez v. Adams*, 895 N.Y.S.2d 532, 538 (3d Dep't 2010); *see* Dobbs, *supra* § 5.2(3) at 722. Replacing a property may cost more

---

we conclude that the purported covenant to rebuild does not alter Plaintiffs' potential tort recoveries, we need not decide whether this lease provision constitutes an unconditional obligation to rebuild.

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page32 of 74

than the pre-destruction value, "but the new [property] itself will be more valuable and last longer." *50 Acres of Land*, 469 U.S. at 34 n.21 (quoting *United States v. 564.54 Acres of Land*, 441 U.S. 506, 518 (1979) (White, *J.*, concurring)).

Plaintiffs' covenants to rebuild the Leased Buildings, then, may require them to devote funds to reconstruction, but do not alter the measure of their potential tort recoveries. Just as a landowner may have a strong economic interest in rebuilding property, a lessor and lessee may wish to ensure that the leased property is rebuilt in the event of destruction. Covenants to repair accomplish that goal by allocating the risk of loss between the two parties. They do not, however, magnify the value of the damage from the property destruction or put the party who has assumed the obligation to rebuild in any worse position than a landowner who, for economic reasons, is forced to rebuild in the absence of a contract. As a result, WTCP and 7WTCo., and similarly situated lessees, should not receive a higher measure of damages than the landowner could have recovered without the contract simply because dividing the interest in land required agreeing, in advance, on how to handle possible damage to the property. *Cf. 50 Acres of Land*, 469 U.S. at 34-35 (concluding that, in the context of just compensation, a plaintiff's "legal obligation" to replace a condemned facility

does not justify a different measure of damages than a party without such an obligation would receive). To hold otherwise would be inconsistent with New York courts' reluctance to consider landowners' decisions to rebuild when selecting the measure of damages, *see Fisher*, 98 N.Y.2d at 534-40, and the general principle that, when property is destroyed or condemned, a lessee is entitled to no more for that loss than the unencumbered value of the fee interest, *see Great Atl. & Pac. Tea Co.*, 22 N.Y.2d at 84.

As an alternative, WTCP and 7WTCo. argue that, in this particular case, diminution of value is an inadequate measure of damages because it does not account for the property's "unique public benefit" — namely, the promotion of economic development in lower Manhattan and northern New Jersey — or its "iconic status." Appellants' Br. at 61-65. In support, they rely on the testimony of their expert witnesses, and contend that a jury should have considered their entitlement to replacement costs. *Cf. Jenkins*, 55 N.Y.2d at 39 (requiring defendant to prove that the lesser measure of damages "will sufficiently compensate for the loss").

We find these arguments unpersuasive. We recognize that, in the context of just compensation for takings, New York courts have noted that, although

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page34 of 74

ordinarily "the fair equivalent of the actual loss sustained" by a property's owner is the property's market value, some property "is of a kind seldom traded, [such that] it lacks a 'market price'" and therefore must be compensated for according to its replacement cost. *Matter of Rochester Urban Renewal Agency*, 45 N.Y.2d 1, 8-9 (1978). But this class of "specialty" property is narrow; "reproduction cost should be utilized only in those limited instances in which no other method of valuation will yield a legally and economically realistic value for the property." *Great Atl. & Pac. Tea Co. v. Kiernan*, 42 N.Y.2d 236, 242 (1977). Accordingly, New York courts have awarded replacement costs only when the property at issue is "specially built" for a "specific purpose" and a "special use," there is "no market for the type of property . . . and no sales of property for such use," and the property's use is "economically feasible and reasonably expected to be replaced." *Application of City of N.Y.*, 680 N.Y.S.2d at 535-36 (quoting *Matter of Cnty. of Nassau*, 349 N.Y.S.2d 422, 427 (2d Dep't 1973)); *see Matter of Saratoga Harness Racing v. Williams*, 91 N.Y.2d 639, 645-46 (1998). "Churches, hospitals, clubhouses and like structures . . . commonly fall within this category" because the building "may be regarded by the organization that owns and utilizes it as worth everything it cost to construct and more, yet it may not be 'marketable'

because no similar group would have sufficient need for the property to be willing to purchase it." *Rochester Urban Renewal Agency*, 45 N.Y.2d at 9.

In light of this standard, there is no genuine dispute of material fact about whether diminution in market value is an adequate measure of damages. At the start, 7WTCo. has presented no evidence that 7 World Trade Center is sufficiently unique, or served such a significant public purpose, to warrant a recovery in excess of lost market value. In fact, Professor Kerry Vandell, the only expert to submit a report about the property, calculated the change in market value to 7WTCo.'s leasehold interest by comparing the expected income streams before and after the September 11th attacks.

As for WTCP, Defendants' submissions conclusively establish that the company's interest in the Main Site Buildings was not "specialty" property for which reproduction cost is the only appropriate measure of damages. WTCP's property interest consists of 99-year leases to five commercial office buildings, with the reversionary interest held by the Port Authority. Far from there being "no market for [this] type of property," *Saratoga Harness Racing*, 91 N.Y.2d at 645, WTCP procured its leasehold interests through what Charles Gargano from the Port Authority called a "worldwide . . . competitive bidding process," J.A. 594.

Michael Levy, from WTCP, agreed that the bidding was "extensive" and "competitive" because the buildings were "trophy" properties. J.A. 598-99. After obtaining the leases, moreover, WTCP operated its Leased Buildings as a landlord, subleasing portions of the property to commercial tenants. This was not a "special use." *Application of City of N.Y.*, 680 N.Y.S.2d at 535-36; *see also Heidorf v. Town of Northumberland*, 985 F. Supp. 250, 262 n.6 (N.D.N.Y. 1997) (distinguishing between a building's historic "status" and the uniqueness of the "use" to which it is put). Quite to the contrary, WTCP's leases *required* the company to "operate and maintain" the properties as "office building[s] . . . in a manner generally consistent with other office buildings located within the Borough of Manhattan," and included a list of comparable buildings in the area. J.A. 414.[12]

[12] Even if, as Plaintiffs claim, no buildings are precisely comparable to the Main Site Buildings, it does not mean that the leases for those buildings lacked a market value. Assessing comparable leases is only one way to value a leasehold interest, and other methods — most notably the capitalization of income approach — are equally valid. *See Allied Corp. v. Town of Camillus*, 80 N.Y.2d 351, 356 (1992) ("[E]vidence of comparable sales is generally the preferred measure of a property's value . . . , but where there is insufficient relevant data, value may be determined by other methods."); *Gordon v. Town of Esopus*, 745 N.Y.S.2d 334, 335 (3d Dep't 2002) (accepting an "income valuation method" when the property was "income producing" and "unique to the extent that no comparable properties exist"); *see also Saratoga Harness Racing*, 91 N.Y.2d at 643. Indeed, "even when alternative theories must be used" courts have shied away from using a "reproduction cost" methodology except for the narrow class of "properties deemed 'specialties.'" *Allied Corp.*, 80 N.Y.2d at 356-57.

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page37 of 74

Nor is WTCP's claim for replacement costs supported by the World Trade Center Complex's public purpose. WTCP's experts attest to the "public purpose" that the World Trade Center Complex serves, noting that it reinvigorated the economic life of lower Manhattan and Northern New Jersey. But WTCP did not lease the entire World Trade Center Complex; its leasehold interest encompassed only the office space in the Main Site Buildings. As Sheldon Gottlieb, WTCP's appraisal expert, explained: "[t]he Port Authority never leased the non-commercial, public purpose, and public benefit part of the properties or their operation to WTCP." J.A. 565 n.4. More fundamentally, in evaluating just compensation, the Supreme Court has refused to compensate private plaintiffs for the community value of their properties. *See 564.54 Acres of Land*, 441 U.S. at 516. The Court's rationale readily applies in the context of tort damages. "The community benefit" a property confers "might provide an indication of the public's loss," but compensatory damages seek to ensure that the "*owner*" of the property is "made whole." *Id.* WTCP "did not hold" its leasehold interests "as the public's trustee and thus is not entitled to be indemnified for the public's loss." *Id.*; *see* N.Y. Unconsol. Law § 6610 (entrusting

the Port Authority with "undertaking . . . [t]he effectuation of the world trade center").[13]

Critically, our conclusion that WTCP and 7WTCo. are not entitled to replacement costs by no means minimizes the importance of the World Trade Center Complex to New York and New Jersey or the country's interest in seeing the site rebuilt. Compensatory damages are not designed, and courts adjudicating civil claims are not well suited, to heal a region's and a nation's wounds. Rather, we simply conclude, agreeing with the district court, that Plaintiffs' leases for the office space at 1, 2, 4, 5, and 7 World Trade Center can be valued according to market metrics, and that Plaintiffs can therefore be compensated by the diminution in the market value of those leasehold interests. Plaintiffs (assuming liability is established) are entitled to compensation for the amount of value that their leasehold interests lost due to the attacks, but not to reconstruction costs.

[13] Although Defendants devote a significant portion of their briefing to the argument that the Port Authority's decision to issue 99-year leases "privatized" the Leased Buildings, we fail to see how this label alters the damages analysis.

**2. Consequential Damages**

In addition to reconstruction costs, WTCP and 7WTCo. also seek consequential damages. Specifically, Plaintiffs argue that they are entitled to recover for the cost of retenanting the Leased Buildings, hiring attorneys during litigation with their insurers, paying mortgage carrying costs, and losing tenant improvements. The district court denied these claims for consequential damages in orders issued on September 30, 2009 and December 5, 2012. We agree, and address each decision in turn.

The decision to deny damages for retenanting costs and lost tenant improvements flows naturally from the conclusion that diminution in market value, rather than replacement cost, is the correct measure of damages. Before the terrorist attacks, the Leased Buildings were fully tenanted. The difference in value of Plaintiffs' leasehold interest before and after September 11, 2001, then, includes the loss of those tenants and any improvements they made to the premises. Put differently, the diminution-in-value measure of damages already compensates Plaintiffs for the fact that they lost tenanted buildings complete with tenant improvements. Viewed in this light, Plaintiffs' claims for the cost of retenanting the Leased Buildings and replacing tenant improvements are

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page40 of 74

nothing more than attempts to recover the cost of restoring the Leased Buildings to the state in which they existed before the attack — the "reconstruction cost" measure of damages for these elements of the leasehold interests. Awarding these costs would therefore compensate Plaintiffs a second time for the same loss. *See Fisher*, 98 N.Y.2d at 540 (noting that "replacement cost and diminution in market value are simply two sides of the same coin"). Such a double recovery would be "wholly inappropriate" under compensatory damages principles. Dobbs, *supra*, § 5.12(2) at 832 ("It would not be appropriate to award both replacement costs and diminished value of the land, since each of these measures of damage is an attempt to compensate for the same loss . . . .").

The other consequential damages claims — for mortgage carrying costs and attorneys' fees — fail on causation grounds. Regarding the former, WTCP and 7WTCo. undertook the obligation to pay mortgage carrying costs before the September 11th attacks; Defendants' alleged negligence neither caused Plaintiffs to bear those expenses, nor increased the price. *See* 103 N.Y. Jur. 2d *Torts* § 10. As to the latter, New York courts allow plaintiffs to recover "the reasonable value of attorneys' fees and other expenses" when, "through the wrongful act of his present adversary, [the plaintiff was] involved in earlier litigation with a third

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page41 of 74

person in bringing or defending an action to protect his interests." *Coopers & Lybrand v. Levitt*, 384 N.Y.S.2d 804, 807 (1st Dep't 1976). "Such expenses," however, must be "the natural and necessary consequences of the defendant's acts," *id.*, such as when an attorney's malpractice exposes the client to liability, *see Cent. Trust Co. v. Goldman*, 417 N.Y.S.2d 359 (4th Dep't 1979). Defendants' alleged negligence lacks this requisite connection. Even assuming, *arguendo*, that Defendants could have reasonably foreseen that their failure to adequately monitor airport security checkpoints could lead to a hijacking *and* that the hijackers would use the planes to destroy buildings, Plaintiffs' attorneys' fees would still not have been the natural and necessary consequence of Defendants' negligence. That causal chain requires three further steps: first, Plaintiffs filing insurance claims; second, the insurers refusing to pay; and third, Plaintiffs filing suit. This series of events is too attenuated to support a claim for attorneys' fees. *See Martinez v. Lazaroff*, 48 N.Y.2d 819, 820 (1979) (concluding, as a matter of law, that defendant was not a "proximate or legal cause of the injuries suffered" because the "causal connection . . . was attenuated"); *see also Apollo Steel Corp. v. Melco Cranes, Inc.*, 609 N.Y.S.2d 121 (4th Dep't 1994). The district court was

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page42 of 74

therefore correct to deny Plaintiffs' claims for consequential damages and to limit their recovery to the diminution in value of their leasehold interests.

**3. Calculation of Diminution in Market Value**

Having concluded that Plaintiffs' compensable damages are limited to the diminution in the market value of their leasehold interests, we turn now to the issue of calculating that change in value. In summary judgment decisions issued on August 30, 2009 and December 5, 2012, the district court decided that the diminution in the value of WTCP and 7WTCo.'s leasehold interests was, at most, $2.805 billion and $737 million, respectively. The first figure derives from the present value of the rental payments that WTCP promised to make over the 99-year lifetime of its leases, and the second is culled from Professor Vandell's evaluation of the pre-attack value of 7WTCo.'s leasehold interest. We conclude that this process for calculating damages misapprehends valuation in the context of leasehold interests. Accordingly, we remand so that the district court can reassess Plaintiffs' maximum possible recoveries.

As the district court recognized, an asset's "market value is the price at which [it] would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page43 of 74

knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *see also* Appraisal of Real Estate, *supra*, at 22. The diminution of an asset's value, then, is calculated by comparing the market value of the asset before and after a particular event. But critically, although the terrorist attacks destroyed the Leased Buildings, the relevant assets being valued in this case are Plaintiffs' *leasehold interests*. In short, when the Port Authority issued leases to WTCP and 7WTCo., it split the interests in the Leased Buildings into a "leased fee estate," which the Port Authority retained, and "leasehold estate[s]" held by Plaintiffs. *See* William B. Brueggeman & Jeffrey D. Fisher, *Real Estate Finance and Investments* 5-6 (14th ed. 2011). Each estate is a distinct asset with its own market value, and it is the diminution in the value of that estate that is the measure of the owner's loss. *See id.*; *see also Great Atl. & Pac. Tea Co.*, 22 N.Y.2d at 84.

The market value of a leasehold estate is the price at which the *lease* — rather than the physical property in the estate — would change hands between a willing buyer and a willing seller in a competitive market. Put differently, a leasehold interest is worth what a buyer in a competitive market would be willing to pay in order to assume both the rights *and* the obligations associated with the lease. This value can be measured in at least two ways: through a "sales

comparison approach," which involves "comparing properties similar to the subject property," Appraisal of Real Estate, *supra*, at 417, or an "income capitalization approach," which requires analyzing expected costs and revenues from the property to generate an assessment of future income, and "capitaliz[ing] the income into an indication of present value," *id.* at 471; *see also id.* at 83; *W.O.R.C. Realty Corp. v. Bd. of Assessors*, 951 N.Y.S.2d 36, 47-48 (2d Dep't 2012) (discussing both methods of valuation in the context of income-producing property). Notably, because a leasehold interest entails expenditures (such as the obligation to pay rent), it can have either a positive or a negative market value.

An example — using, for simplicity's sake, the "sales comparison approach" — illustrates the point.[14] Suppose a lessee rents a building for $500/month, and the market rate for renting a comparable property is $600/month. In such a scenario, the lessee's interest has a positive market value because a buyer should be willing to pay up to $100/month to assume the lease. *See* James R. MacCrate, *The Valuation of Leasehold Interests*, Real Estate Appraisal

[14] Plaintiffs' expert, Professor Vandell, employed the income capitalization approach when calculating the extent to which the value of Plaintiffs' leasehold interests changed because of the attacks. While this is an accepted method for valuing leasehold interests, we conclude that Vandell's calculations inappropriately included costs associated with replacing the leased buildings. Because the district court may revisit valuations using the income capitalization approach on remand, we explain our reasoning *infra*.

and Valuation Issues (June 2, 2010),https://realestatevaluation.wordpress.com/2010/06/02/the-valuation-of-leasehold-interests/ ("A positive leasehold is created when the market rent is greater than the contract rent."). Now suppose the market rental rate for comparable spaces was $400/month — or, more relevantly for this case, that the lessee's property suffered damage that made it comparable to spaces renting for $400/month. Under those circumstances, no buyer would be willing to *pay* to assume the $500/month lease when she could rent a comparable property for $400/month. Instead, the *lessee* would need to pay buyers to entice them to assume the lease's obligations, thus leading to a *negative* market value for the leasehold interest. *See* Appraisal of Real Estate, *supra*, at 83.

As Plaintiffs' experts explained, the district court's evaluation of the leasehold interests did not follow traditional principles of valuation and incorrectly assumed that a leasehold interest cannot have negative value. Determining the diminution in value of Plaintiffs' leasehold estates requires calculating the difference between the pre- and post-attack market values of those interests. For WTCP, the district court concluded that the pre-attack value of the leasehold interest was $2.805 billion and that the post-attack value was $0.

Neither figure is correct. Opposing summary judgment, WTCP's expert Sheldon Gottlieb explained that $2.805 billion "reflects only the net present value . . . of rental payments that WTCP committed to make to the Port Authority," and not the pre-attack value of the leasehold interest. J.A. 559. We agree. WTCP's rental payments *created* the leasehold interest, but do not necessarily reflect the amount that a buyer in the open market would have paid to *assume* WTCP's rights and obligations under the leases — the relevant inquiry when assessing the market value of a leasehold estate. Similarly, $0 is an incorrect post-attack valuation. Although WTCP could expect to receive $0 in rent from the destroyed buildings, that figure fails to account for the company's obligation to, at a minimum, continue paying rent. Thus, as Gottlieb explained in opposition to summary judgment and Vandell reiterated, WTCP's leasehold interests had a *negative* value after the attacks, and the diminution-in-value calculation must incorporate that negative market value. *See* J.A. 569 (Gottlieb noting that the leasehold interest had a "negative value" after the attacks); J.A. 624 (Vandell discussing "negative fair market value").

The district court took a different approach when evaluating damages for 7WTCo. Plaintiffs' expert, Professor Vandell, assessed the value of 7WTCo.'s

leasehold interest using the income capitalization approach and determined that, immediately before September 11, 2001, it was worth $737 million. The district court adopted this figure as the pre-attack market value. But rather than assessing the post-attack value under a similar approach, the court again declared the post-attack leasehold value to be $0, leading to total losses of $737 million. Again, $0 reflects the rent that 7WTCo. could expect to receive for its destroyed building, but misstates the post-attack value of the leasehold interest because, at a minimum, it fails to account for the continued obligation to pay rent.

Thus, for both WTCP and 7WTCo., the district court calculated the decline in value of their leasehold interests in a manner that is inconsistent with the established practice for valuing leasehold estates. Because this error potentially led to incorrect diminution-in-value calculations, we remand for the district court to reassess Plaintiffs' maximum recoverable damages.

Nonetheless, our conclusion that the district court incorrectly assessed the diminution in value of Plaintiffs' leasehold interests should not be confused with an endorsement of Plaintiffs' damages claims nor taken to mean that Plaintiffs are necessarily entitled to a trial on damages or to a damages recovery. As to the

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page48 of 74

flaws in Plaintiffs' appraisal of damages, the district court was correct to observe that both WTCP and 7WTCo. ignored its denial of reconstruction costs in their diminution-in-value calculations. In his reports on damages, Professor Vandell calculated the pre- and post-attack values of Plaintiffs' leasehold interests by estimating the expected income and expenses associated with those interests — in other words, by using the "income capitalization approach." As Plaintiffs acknowledge in their brief on appeal, Professor Vandell's assessments include, as part of the post-attack valuations, reconstruction costs, tenant improvement allowances, leasing commissions, and projected capital expenditures — all of which are costs associated with replacing the Leased Buildings. *See* Appellants' Br. at 69 n.44. To be consistent with the denial of reconstruction costs, the post-attack leasehold value should reflect only those continuing obligations that are *unrelated* to reconstruction, such as rental payments. In other words, the post-attack valuation should operate under the hypothetical that the Leased Buildings were not rebuilt.[15]

---

[15] We note that Professor Vandell's post-attack valuation also included the value of expected rental income and operating expenses after reconstruction. Because these cash flows assume that Plaintiffs reconstructed the Leased Buildings, the district court likely should exclude them from the post-attack valuation.

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page49 of 74

It is also significant that WTCP signed its lease agreements shortly before the terrorist attacks. The district court was correct to observe that market value often reflects expected profits. Indeed, both this Court and New York courts agree that "[m]arket value damages are 'based on future profits as estimated by potential buyers who form the 'market,' and 'reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.'" *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) (quoting 1 Dobbs, *supra*, § 3.3(7)); *see Sandoro v. Harlem-Genesee Mkt. & Nursery, Inc.*, 482 N.Y.S.2d 165, 167 (3d Dep't 1984). When there is "a recent sale price for the subject asset, negotiated by parties at arm's length," that price may be the "best evidence" of the asset's "market value," taking into account expected profits. *Schonfeld*, 218 F.3d at 178 (internal quotation marks omitted); *see W.T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 511 (1981).

As a result, WTCP is incorrect to state that it was "entitled to a reasonable rate of return" above the rent it agreed to pay. Appellants' Br. at 72. Purchasing a commercial leasehold interest, like any other business venture, entails risk. The fact that WTCP agreed to pay $2.805 billion in rent just months before the attack may be evidence that the pre-attack value of its leasehold interest was $0. That is, if WTCP was the highest bidder in a competitive market for the Leased

Buildings, no other buyer would have been willing to *pay WTCP* to assume the leasehold interest. *See Schonfeld*, 218 F.3d at 176; J.A. 632 ("[F]air market value represents the amount an investor . . . would be willing to pay for an assignment of the Net Leases . . . ."). On the other hand, WTCP contends that the pre-attack value of its leasehold interest was $1.459 billion, relying in part on "increases in market rents and net operating income levels that were reasonably expected when management of the space . . . was transferred . . . to an experienced manager such as WTCP." J.A. 633. The district court recognized that the market value of the leaseholds may have changed between April 2001, when WTCP acquired the Main Site Leases, and September 2001, immediately prior to the destruction of the properties, and it provided WTCP an opportunity to raise a material issue of fact as to whether this had occurred. We leave it to the district court to decide, in the first instance, whether there is a genuine dispute of material fact about whether WTCP's pre-attack leasehold interests had positive value, using the principles outlined here. But it is emphatically not the case that Plaintiffs are entitled to damages that reflect a *guaranteed* profit on their leases.

In sum, our decision is a narrow one. We agree with the district court's decision that Plaintiffs can recover only for the diminution in the value of their

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page51 of 74

leasehold interests, and are not entitled to reconstruction costs or the claimed consequential damages. Nonetheless, we conclude that, as Plaintiffs' experts opined in their reports, the district court's evaluation of WTCP and 7WTCo.'s losses departed from established methods of valuing leasehold estates. Accordingly, we remand as to the August 30, 2004 and December 5, 2012 orders establishing the diminution in value of Plaintiffs' leasehold interests. On remand, the district court should reassess the diminution in value of those leasehold estates by considering their pre- and post-attack market values, with the post-attack values measured as if the Leased Buildings were not reconstructed. The district court is free to decide, in the first instance, whether additional discovery is needed before another set of summary judgment motions or a trial on the issue of damages.[16]

[16] The district court could allow additional discovery or conduct a limited trial on damages, but may find such steps unnecessary. For instance, if the court concludes, on the existing record, that the pre-attack value of WTCP's leasehold interests was $0, it may be able to calculate their post-attack value from Vandell's report (or perhaps to determine that such a specific calculation is unnecessary because the calculation could not result in an award greater than the Plaintiff's insurance recovery). To ensure that the post-attack value does not include costs and revenues associated with reconstruction, the court in referring to Vandell's report would need to exclude "[r]ebuilding [c]osts," J.A. 640, and "[p]rojected [r]evenues," J.A. 643, and include only those "[p]rojected [c]osts," J.A. 644-45, that WTCP would have incurred had the Main Site Buildings not been rebuilt.

**B. Collateral Offset**

Because we agree with the district court that WTCP and 7WTCo. can recover only for the diminution in value of their leasehold interests, we must address the second pillar of the decision below: the conclusion that Plaintiffs' insurance recoveries should reduce the amount of their potential tort award. "In most jurisdictions[,] the damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance." *Healy v. Rennert*, 9 N.Y.2d 202, 206 (1961). But New York has chosen to override this "collateral source rule" by statute. *See Oden v. Chemung Cnty. Indus. Dev. Agency*, 87 N.Y.2d 81, 85-86 (1995). Pursuant to CPLR § 4545, if a court finds that any "cost or expense" from an "injury to property" will be, or has been, "replaced or indemnified from any collateral source," such as insurance, the court "shall reduce the amount of the award" for that injury by an amount equal to the collateral reimbursement. *Id.* § 4545(c). This provision is designed to assure that plaintiffs do not receive "duplicative recoveries" for the same *type* of loss. *Fisher*, 98 N.Y.2d at 538. As a result, a defendant must show, by clear and convincing evidence, that "the collateral source payment represents reimbursement for a particular category of loss that corresponds to a category of

loss for which damages were awarded." *Oden*, 87 N.Y.2d at 84; *see also Johnson v. N.Y.C. Transit Auth.*, 929 N.Y.S.2d 215, 220 (1st Dep't 2011).

Here, the district court conducted a bench trial to identify the specific losses for which Plaintiffs' insurance proceeds reimbursed them, and to determine whether those reimbursements correspond to the same category of loss as their potential tort recovery. After five days of testimony, on August 1, 2013 the court found that nearly all of WTCP and 7WTCo.'s insurance proceeds reimbursed them for the costs of reconstructing the Leased Buildings and for "business interruption," *i.e.*, lost revenue while the Buildings were being rebuilt.[17] S.P.A. 81. It then concluded that both these insurance proceeds and the potential tort awards for lost leasehold value provide reimbursement for the same category of loss, and therefore reduced the potential tort awards by the value of the insurance recoveries.[18] We conclude that the district court did not

[17] The district court allocated $1.8 million of 7WTCo.'s insurance recoveries to lost personal property. 7WTCo. and Defendants have reached a settlement regarding the company's claims for lost personal property, making this portion of the insurance recoveries irrelevant for the purposes of this appeal.

[18] Before offsetting insurance recoveries against the potential tort award, the district court deducted the amount Plaintiffs spent on claims-preparation expenses from the total insurance recovery. This decision was not error. CPLR § 4545 directs courts to reduce awards by the amount of collateral recoveries "minus an amount equal to" certain past premium payments and the ongoing "cost to the plaintiff of maintaining such benefits." When an insurance policy requires the insured to investigate their own

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page54 of 74

err, much less clearly err, in allocating Plaintiffs' insurance recoveries to replacement costs and business interruption losses, and agree with its conclusion that these reimbursements correspond to the same loss as the potential tort award.

We begin, however, on a procedural note. No doubt due to the large size of the insurance recoveries, the district court opted to conduct a bench trial on the collateral offset issue before a trial on liability and damages. Decisions to bifurcate trials, like this one, are authorized by Federal Rule of Civil Procedure 42(b) and are typically well within the discretion of district courts. *See Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999). But Plaintiffs contend that the timing of the collateral offset trial was inappropriate in this case because CPLR § 4545 "makes clear that a 'correspondence' hearing should not occur until *after* the jury has reached a verdict" on liability and damages. Appellants' Br. at 86.

Plaintiffs' argument misapprehends the role of New York law under the ATSSSA. The ATSSSA creates a federal cause of action for damages arising out of the September 11, 2001 attacks, and incorporates state law as the "*substantive*

---

claims and submit proofs of loss, those expenditures may be counted as costs of "maintaining [the insurance] benefits."

law for decision in any such suit." ATSSSA § 408(2) (emphasis added). Federal law controls *procedure*, and the order in which issues are decided is quintessentially procedural — it "governs only the manner and the means by which the litigants' rights are enforced," not "the rules of decision by which the court will adjudicate those rights." *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (internal quotation marks and brackets omitted). Of course, there may be situations in which deciding the collateral offset issue before a damages trial is impossible, particularly if there are multiple types of loss for which the jury could compensate the plaintiff. *See Shue v. Red Creek Cent. Sch. Dist.*, 697 N.Y.S.2d 437, 439 (4th Dep't 1999) (reversing a collateral offset decision because the jury had not allocated damages to the different losses). But this is not such a case. Here, the district court could predict, with complete certainty, the element of loss for which a jury would award damage because WTCP and 7WTCo. can recover *only* for the diminution in the market value of their leasehold interests. *See Oden*, 87 N.Y.2d at 89 ("The problem of matching up a collateral source to an item of loss is simply a matter of proof and factual analysis."). The district court therefore had a firm legal basis for trying the collateral offset issue first, and did not abuse its discretion in doing so.

Turning to the substance of the district court's decision, Plaintiffs raise two primary challenges. First, they argue that it was error to allocate their insurance recoveries to replacement costs and business interruption losses. Second, they contend that, even if it was possible to allocate their collateral recoveries to replacement costs and business interruption losses, those reimbursements do not correspond to the potential tort recovery for the lost market value of their leasehold interests. Neither argument is persuasive.

The district court did not err by allocating the insurance recoveries to replacement costs and business interruption. The court found, and Plaintiffs' experts agreed, that WTCP and 7WTCo. obtained two categories of insurance coverage: "replacement cost" coverage, which covers damages to the buildings, tenant improvements, personal property, and equipment, J.A. 1227; and "business interruption" coverage, which reimburses for "loss of revenues or rental values . . . from the date of the loss until" the buildings are restored, J.A. 1165. *See* S.P.A. 79. The district court also found that, when WTCP and 7WTCo. submitted proofs of loss after the terrorist attacks, those submissions attached a dollar value only to the costs of replacing the Leased Buildings and to business interruption losses. Plaintiffs concede this point as well, admitting that these

losses, by themselves, exceeded the value of the insurance policies. Appellants' Br. at 24-26.

Nonetheless, Plaintiffs contend that, because they received their insurance reimbursements in the form of "global settlement[s]" reached after litigation with the insurers, Appellants' Br. at 88, the district court should not have allocated their insurance proceeds to replacement costs and business interruption losses. In particular, they note that the settlements released "all claims" against insurers, which they contend could include the value of "extracontractual claims for bad faith" that they raised during the litigation. Appellants' Br. at 88-89. The district court rejected this argument, and the record supports that decision. Defendants' insurance expert, Michael Beach, explained that settlements are common in the insurance industry even when disputes do not go to litigation, and that settlements typically contain a general release to ensure that there will be "no further claims paid in relation to the insurance event." J.A. 1175. To determine what the settlement paid the insured for, one needs to "rely upon the underlying documents" submitted, which did not, in his opinion, "suggest that the insurers paid on anything other than" the replacement cost and business interruption claims. *Id.* Indeed, Plaintiffs' own insurance expert also did not allocate any

money to "extra-contractual claims" when evaluating WTCP and 7WTCo.'s insurance recoveries, J.A. 1234, and the district court found that "[t]he recovery against nearly every insurer was at, or near, the policy limits," S.P.A. 90-91. On these facts, it was not error to allocate Plaintiffs' insurance proceeds to the only two categories of coverage they obtained: replacement cost coverage and business interruption coverage.[19]

Plaintiffs' second argument — that replacement costs and business interruption losses do not correspond to the same category of loss as the diminution in the market value of Plaintiffs' leasehold interests — fares no better. Our analysis begins, and in large part ends, with the New York Court of Appeals decision in *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d at 534. In that case, the defendant negligently destroyed the plaintiffs' residence in a construction accident. The plaintiffs received insurance payments to cover "the actual

[19] Plaintiffs note that, in *Shue v. Red Creek Central School District*, 697 N.Y.S.2d 437 (4th Dep't 1999), and *Boshnakov v. Board of Education of Town of Eden*, 716 N.Y.S.2d 520 (4th Dep't 2000), courts refused to find correspondence when juries issued verdicts that did not assign damages to "each element of loss." *Shue*, 697 N.Y.S.2d at 439. Unitemized jury verdicts are not analogous to Plaintiffs' insurance recoveries. Quite simply, in the context of a trial, the defendant has an opportunity to request an itemized verdict and, if it fails to do so, it becomes impossible to recreate the jury's decisionmaking. Here, however, the district court could ascertain the allocation of the settlements from the record of expert testimony about industry practice and the circumstances surrounding the insurance claims.

necessary cost of replacing the home" and, after a lawsuit, won damages equivalent to the "market value diminution" of their property. *Id.* at 536-37. Before entering judgment, however, the trial court offset the insurance recoveries against the tort award. The Court of Appeals affirmed. Characterizing the harm that the plaintiffs suffered as "real property losses," the Court noted that such losses "may be measured" by the lesser of "the cost of restoring the land to its former condition" or "the diminution in the market value of the whole property." *Id.* at 539. It then rejected the argument that "cost of restoration and diminution in market value represent two different categories of loss," explaining that these are "simply two sides of the same coin": "[e]ach is a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner." *Id.* at 539-40. Thus, because both measures of damages "*correspond*[] to [the] property loss," they can and should be offset against one another. *Id.*

The district court concluded that the logic of *Fisher* applies in this case, and that Plaintiffs' insurance proceeds and potential tort recovery both compensate for the same loss. S.P.A. 88-90. We agree. At trial, Defendants' expert, Professor Daniel Fischel, explained that, as in *Fisher*, the relevant category of loss in this

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page60 of 74

case is the "loss relating to destruction of property." J.A. 1199. Both diminution in market value (the potential tort recovery) and the combination of replacement costs and business interruption compensation (the insurance recovery) reimburse Plaintiffs for this same type of injury.

The market value of income-producing properties like WTCP and 7WTCo.'s leasehold interests, according to Fischel, is "the present value of the profits that [a buyer] expects to get from [those] asset[s]." J.A. 1200. When the property is damaged or destroyed, the property owner loses all, or some, of those expected profits. And because the property's market value simply reflects the present value of expected profits, the property's value falls accordingly. Thus, an award measured by the diminution in the property's market value compensates for the damage to the property by replacing the "present value of . . . [the] lost profit stream." J.A. 1200.

The *combination* of replacement cost and business interruption compensation accomplish this same goal of replacing the property owner's lost profits. Replacement costs allow Plaintiffs to repair the Leased Buildings, thereby restoring the revenue stream from those properties. J.A. 1199. Business interruption compensation then fills the "gap in time between . . . the date of the

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page61 of 74

destruction of the property and the time that the property is rebuilt," J.A. 1200, by substituting for the rental income lost during the rebuilding period. *See* J.A. 1205; *Scribner*, 138 F.3d at 472 (noting that replacement costs include the "reduction of the rental or usable value of the property during the pendency of the injury" (internal quotation marks omitted)). In other words, replacement costs "restore [Plaintiffs'] income stream as a result of the building[s] being completed," and business interruption coverage compensates "for their loss of revenues . . . from the date of the loss until those buildings were restored," J.A. 1165, combining to produce a recovery that has precisely the same effect as an award based on the diminution in the leasehold's value. Thus, although "replacement cost" and "business interruption cost" may be distinct categories when it comes to insurance coverage, they nonetheless rectify the same "category of loss" when it comes to tort recovery: namely, loss from the destruction of property.[20] *See Fisher*, 98 N.Y.2d at 540.

---

[20] Perhaps recognizing the shortcomings in their legal position, Plaintiffs reiterate that their actual rebuilding expenses exceeded both the diminution in value of their leasehold interests and their insurance recoveries. This is simply an attempt to relitigate an issue we decided earlier in this opinion — whether WTCP and 7WTCo. are entitled to recover reconstruction costs — and is not relevant to whether Plaintiffs' insurance recoveries correspond to the same category of loss as diminution in market value.

To summarize, we agree with the district court's decision to allocate Plaintiffs' insurance recoveries to replacement costs and business interruption losses, and with its conclusion that those insurance reimbursements correspond to the same category of loss as Plaintiffs' potential tort recoveries. It was therefore necessary, under CPLR § 4545, to reduce Plaintiffs' tort damages by the amount of their insurance recoveries. Nonetheless, because we set aside the district court's orders calculating WTCP and 7WTCo.'s maximum recoverable damages, we must also vacate the portion of the August 1, 2013 order that reduces those damages to zero and enters judgment for Defendants. The district court should return to the offset issue after reassessing the extent to which the value of Plaintiffs' leasehold interests declined due to the attacks.[21]

**C. Prejudgment Interest**

Plaintiffs' last argument regarding damages focuses on the award of prejudgment interest. In actions for property damage, New York law provides that prejudgment "[i]nterest shall be recovered upon [the] sum awarded," CPLR

[21] WTCP's argument that it must be able to recover separately for its $491.3 million upfront payment to the Port Authority is unavailing. Tort damages compensate Plaintiffs for the loss in value of their leasehold interests, not for particular payments that they made to obtain those interests. There is no separate category of damages for that initial payment to obtain the leasehold interests.

§ 5001, "at a rate of [9%] per annum," *id.* § 5004. These provisions "impose[] an affirmative mandate on trial courts," and leave "no discretion not to award prejudgment interest under New York law." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 93 (2d Cir. 2000) (per curiam). Pursuant to federal law, by contrast, "Congress has enacted a statute governing the award of *postjudgment* interest," but "there is no comparable legislation regarding prejudgment interest." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995). The issue of prejudgment interest is therefore "governed by traditional judge-made principles" and is typically left to the discretion of district courts. *Id.*; *see also SEC v. Contorinis*, 743 F.3d 296, 307-08 (2d Cir. 2014). On appeal, WTCP and 7WTCo. contend that the district court erred by crafting an interest award under federal principles rather than applying New York's statutory rate.

We conclude that, under the ATSSSA, New York law determines the rate at which prejudgment interest accrues. As discussed earlier, the ATSSSA creates a federal cause of action for damages and directs that "[t]he substantive law for decision in any such suit shall be derived from the law" of the state in which the injury occurred — in this case, New York. ATSSSA § 408(b)(2). This command to look to New York law includes the State's law of damages, *see Virgilio v. City of*

*New York*, 407 F.3d 105, 116 (2d Cir. 2005), and we have long held that "[t]he awarding of prejudgment interest is considered" part of New York's "substantive law," *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999). Accordingly, it is the New York statutes, and not federal judge-made principles, that determine prejudgment interest awards under the ATSSSA.

Defendants respond that state substantive law does not apply under the ATSSSA when "such law is inconsistent with or preempted by Federal law." ATSSSA § 408(b)(2). But New York's prejudgment interest statutes create no such inconsistency. Federal prejudgment interest law is a matter of judicial discretion and, like other federal common law doctrines, must give way when a Congressional statute dictates a particular measure of damages. *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 651-53 (1983) (concluding that reference to "interest" in statute overrode longstanding common law doctrine of prejudgment interest). Defendants, too, rely on this principle — otherwise they could not argue that CPLR § 4545 replaces the federal common law rule against reducing damages by the amount of collateral recoveries. *See* Appellants' Br. at 87; *see also Blake v. Del. & Hudson Ry. Co.*, 484 F.2d 204, 205-06 (2d Cir. 1973). Moreover, when Congress has adopted state substantive law in other federal

statutes and did not wish to make state prejudgment interest available, it has explicitly said so. *See United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1639 (2015) (noting that, under the Federal Tort Claims Act, Congress explicitly prevented recovery of prejudgment interest). The ATSSSA contains no such limitation.

Nor does state prejudgment interest conflict with the purpose of the ATSSSA. As we explained in *In re September 11 Property Damage Litigation*, 650 F.3d 145 (2d Cir. 2011), Congress enacted the ATSSSA in part to "preserve the continued viability of the United States air transportation system from potentially ruinous tort liability." *Id.* at 152. It accomplished this goal by capping the extent of the airlines' liability, not by limiting plaintiffs' tort recoveries. *Cf. id.* at 152-53 (concluding that the ATSSSA did not create a "limited fund" for recovery or restrict the manner in which plaintiffs could settle claims). We therefore agree with WTCP and 7WTCo. that New York's prejudgment interest statutes, and not federal common law, governs the rate of their prejudgment interest award.

This decision does not, however, end our analysis of prejudgment interest. As Defendants observe, awarding interest also requires determining the base amount from which that interest is calculated. On that issue, we conclude that

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page66 of 74

the district court should calculate interest on the final tort award, and not the diminution in the value of Plaintiffs' leasehold interests; in other words, the district court should perform the insurance setoff *before* calculating the prejudgment interest. CPLR § 5001 requires that interest be "recovered upon a *sum awarded*." *See Mfr.'s & Traders Trust Co. v. Reliance Ins. Co.*, 8 N.Y.3d 583, 588-89 (2007). As the Court of Appeals has explained, this recovery "is intended to indemnify successful plaintiffs for the nonpayment of *what is due to them*, and is not meant to punish defendants for delaying the final resolution of the litigation." *Love v. State*, 78 N.Y.2d 540, 544 (1991) (emphasis added) (internal citation and quotation marks omitted). CPLR § 4545 plays an important role in determining what amount a plaintiff is due by requiring courts to "reduce the amount of the award" to reflect collateral setoffs. Plaintiffs do not receive, nor were they ever entitled, to the amount before the setoff. *See* CPLR § 4545 (requiring setoff even when the collateral reimbursement has not yet been made). It therefore makes little sense to have Defendants indemnify Plaintiffs — by way of prejudgment interest payments — for an amount that Defendants never owed.

Accordingly, the district court erred at the September 27, 2012 hearing in setting the prejudgment interest rate and in its August 1, 2013 order calculating

interest based on the diminution in value of Plaintiffs' leasehold interests. On remand, we direct the district court to calculate prejudgment interest on the amount of the *final* award using the New York statutory rate. In other words, the district court should reassess the lost value of Plaintiffs' leasehold estates, reduce that amount by the collateral setoff, and only then calculate prejudgment interest based on the resulting award (if any) at the New York rate, running from the date of the attacks.

**D. United's Duty as to Flight 11**

Finally, the district court dismissed 7WTCo.'s claims against United Continental Holdings, Inc. and United Airlines, Inc. (collectively, "United"), after concluding that United had no "connection to Flight 11 or its hijackers," S.P.A. 56, and therefore "did not owe 7WTCo a duty of care," S.P.A. 58. We agree with the district court's well-reasoned decision on this score, and therefore affirm its dismissal of 7WTCo.'s claims against United.

On the morning of September 11, 2001, two terrorists entered Portland International Jetport ("PWM") in Portland, Maine, with plans to take US Airways/Colgan Flight 5930 to Boston. They received tickets at the US Airways counter and then passed through PWM's security checkpoint before boarding the

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page68 of 74

plane. Because PWM had only one such checkpoint, the airlines flying out of the terminal — including United — had signed a "Shared Responsibility Agreement," under which Delta Air Lines assumed "responsibility for the overall operation of the passenger security screening checkpoint," including the training of employees and conducting of employee background checks. J.A. 357. This agreement was United's only connection to US Airways/Colgan Flight 5930.

After arriving at Boston's Logan Airport, the hijackers obtained boarding passes for American Airlines Flight 11 at the American Airlines desk in Terminal A. They then entered a second security screening checkpoint — this one operated by Globe Aviation Services under a contract with American Airlines — before boarding Flight 11. Three other hijackers arrived at Logan Airport by car and followed the same route to the plane. United's gates and security checkpoints were located in a different terminal than those of American Airlines, and United had no responsibility for ticketing or security along the terrorists' route to Flight 11. Once on board the flight, the terrorists hijacked the plane and crashed it into 1 World Trade Center. "As 1 World Trade Center collapsed, it spewed debris, some of which pierced the façade of 7 World Trade Center . . . , causing fires and, eventually," the building's collapse. S.P.A. 48.

On these facts, the district court correctly concluded that United had no connection to Flight 11 or its hijackers and therefore owed no duty to 7WTCo. Under New York law, the scope of a tortfeasor's duty "is, in the first instance, a legal issue for the court to resolve." *Waters v. N.Y.C. Hous. Auth.*, 69 N.Y.2d 225, 229 (1987). This analysis is fundamentally about "apportioning risks and allocating the burden of loss," *id.*, and it is the "responsibility of courts . . . to limit the legal consequences of wrongs to a controllable degree and to protect against crushing exposure to liability," *Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 402 (1985) (internal quotation marks and citations omitted). To that end, New York courts "have been cautious . . . in extending liability to defendants for their failure to control the conduct of others" by limiting such liability to situations in which "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232-33 (2001). This cautious approach is necessary to guard against "the specter of limitless liability" and to constrain the class of possible plaintiffs. *Id.* at 233.

We applied these principles in the context of airline security in *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996). In that case, four terrorists

purchased "interline tickets" that allowed them to board Middle East Airlines ("MEA") Flight 426 in Beirut and then transfer, without a new ticket or second baggage check, to a Kuwait Airways flight in Dubai. *Id.* at 120. MEA employees sold the tickets, checked the terrorists' visas and passports, took their bags, and were generally "the first line of defense" in Beirut Airport's notoriously lax security system. *Id.* The terrorists then boarded Flight 426, and transferred directly to their Kuwait Airways flight in Dubai, which they hijacked. *Id.* at 121. After the hijacking, they tortured three American passengers, who later brought suit against, *inter alia*, MEA. In what we deemed a "close call," this Court concluded that MEA owed a duty of care to the plaintiffs. *Id.* at 127. To reach that result, the panel relied on the fact that, because the terrorists checked in at MEA's ticketing desk and the airline knew about the poor security at Beirut airport, it was well situated to implement additional screening measures. *Id.* at 124. Moreover, MEA's duty extended to the Kuwait Airways flight because MEA knew that, under the interline ticketing program, passengers would not need to pass through a second round of screening before boarding the next flight. *Id.*

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page71 of 74

Here, by contrast, United was never in a position to serve as "the first line of defense" for Flight 11. In Portland, US Airways controlled ticketing for Flight 5930 and Delta Airlines had responsibility for the airport security checkpoint. United was a party to the Shared Responsibility Agreement regarding the checkpoint, but that title is a misnomer: the Agreement *transferred* operational control over the checkpoint from United (and other airlines) to Delta alone. Moreover, unlike in *Stanford*, there was no interline ticketing program to connect security in Portland to security in Boston. Instead, the September 11th hijackers had to go through an entirely separate set of controls at Logan before boarding Flight 11. United had no connection to those controls and, indeed, was not even located in the same terminal. Thus, unlike in *Stanford*, "both logic and public policy weigh heavily" against a duty to 7WTCo. under these circumstances. *Waters*, 69 N.Y.2d at 230. United had "no control over either the acts of the primary wrongdoer or the conditions" of the ticketing and security checkpoints the terrorists used. *Id.* Nor would the goal of increasing safety "materially be advanced" by expanding liability to defendants in United's situation: each airline already has ample incentive, both because of tort liability and federal regulations, to police the ticketing desks and security checkpoints that they

actually operate. *Id.* Accordingly, we affirm the district court's decision to dismiss 7WTCo.'s claims against United.

**CONCLUSION**

To summarize:

(1) Under the "lesser of two" principle (and assuming that Defendants' liability can be established), Plaintiffs are entitled to recover an amount equal to the diminution in value of their leasehold interests, but not the cost of rebuilding the Leased Buildings.

(2) The district court properly concluded that Plaintiffs may not recover for retenanting the Leased Buildings, hiring attorneys during litigation with their insurers, paying mortgage carrying costs, and losing tenant improvements. It was also correct to reduce the amount of Plaintiffs' insurance recoveries by the cost of preparing insurance claims, rather than treating those expenses as a separate category of damages.

(3) The district court applied an incorrect valuation methodology when determining that the value of WTCP and 7WTCo.'s leasehold interests fell by, at most, $2.805 billion and $737 million, respectively. We therefore remand for reconsideration of this valuation.

(4) Because the ATSSSA creates a federal cause of action and incorporates only state substantive law, the district court did not err by conducting a collateral offset hearing pursuant to CPLR § 4545 before a trial on liability or damages. Moreover, the district court's finding that Plaintiffs' insurance recoveries reimbursed them for the costs of reconstructing the Leased Buildings and for business interruption was not clearly erroneous, and we agree with its

decision that those reimbursements correspond to the same category of loss as the diminution in value of their leasehold interests.

(5) Prejudgment interest should be calculated using New York's statutory rate and based on the amount of the award *after* the collateral offset, rather than the diminution in value of Plaintiffs' leasehold interests.

(6) The district court correctly dismissed 7WTCo.'s claims against United after concluding that United owed no duty of care regarding Flight 11.

On remand, the district court may, consistent with the guidance in this opinion, determine the diminution in value of Plaintiffs' leasehold interests on the evidence already submitted, after allowing additional fact-gathering, or through a trial on damages. It should then offset Plaintiffs' insurance proceeds against those hypothetical tort recoveries, and calculate prejudgment interest, if necessary, based on the remainder.

Accordingly, we **AFFIRM** the judgment of the district court dismissing 7WTCo.'s claims against United. As described above, we also **AFFIRM** the district court's judgment insofar as it properly applied the "lesser of two" principle to limit Plaintiffs' damages, properly denied Plaintiffs' claims for consequential damages, and properly applied CPLR § 4545. Finally, we **VACATE** the judgment in part and **REMAND** with instructions to assess the lost

Case 13-3619, Document 247-1, 09/17/2015, 1600544, Page74 of 74

market value of Plaintiffs' leasehold interests and, if necessary, to recalculate the award of prejudgment interest in a manner consistent with this opinion.

Case 13-3619, Document 248, 09/17/2015, 1600551, Page1 of 17



STRAUB, *Circuit Judge*, concurring in part and dissenting in part:

I concur with the majority in some respects; specifically, in its: (i) denial of the plaintiffs-appellants' ("Plaintiffs") claims for consequential damages; (ii) affirmance of the District Court's findings of correspondence under N.Y. C.P.L.R. 4545; (iii) determination of the proper prejudgment interest to be applied; and (iv) affirmance of the dismissal of certain claims against United Airlines regarding Flight 11.

But for the reasons that follow, I respectfully dissent from the majority's decision limiting Plaintiffs' potential tort recovery as a matter of law. That determination raises complex, important, and novel questions of New York law that are best addressed by certification for decision by the New York Court of Appeals.

In this case, stated basically, Plaintiffs leased public property—buildings in the World Trade Center—in return for rental payments and various other obligations, including, they contend, an assurance to the property's government owner to repair any damage to the property during the leases' term. After the

property was tragically destroyed, Plaintiffs suffered catastrophic economic losses: they assert that not only must they continue to make rental payments on their leases, but they must also pay for the World Trade Center's rebuilding. Plaintiffs sued the defendants-appellants ("Defendants") for compensation for these losses, alleging that Defendants' negligence led to the World Trade Center's destruction.

The majority permits Plaintiffs some recovery—mostly for the reduction in rental value of their leases—but it categorically prohibits Plaintiffs from obtaining compensation from Defendants for the substantial costs of rebuilding the World Trade Center.[1] In so doing, the majority decides two novel questions of New York law that, in my view, should instead be addressed in the first instance by the New York Court of Appeals.

Each of the two questions, if decided in Plaintiffs' favor, could allow some recovery for rebuilding costs. The first novel question of New York law is

[1] Contrary to the majority's suggestion, *see* Maj. Op. at 31, Plaintiffs seek compensation only for the amounts necessary to rebuild the World Trade Center as it was before September 11, 2001, *see* Brief for Plaintiffs at 14, 52 n.36; Reply Brief for Plaintiffs at 13.

Case 13-3619, Document 248, 09/17/2015, 1600551, Page3 of 17



whether Plaintiffs can recover for the diminution in value of their leases caused by the leases' obligation to rebuild. The majority excludes consideration of this loss as a matter of law, but New York's highest court might reasonably instead consider it a jury question of proximate cause. The second novel question of New York law is whether Plaintiffs can alternatively recover for their rebuilding costs based on the World Trade Center's public value. Again, the majority rejects this basis for recovery as a matter of law, but where Plaintiffs were obligated to repair damage to state property and have claimed that doing so is merited by the property's public value, New York's highest court could justifiably find that equity warrants compensation from the tortfeasor that caused the property's damage.

New York's courts have not addressed these questions (or anything close to them), and I do not believe that we can confidently predict how the New York Court of Appeals would resolve them. At the least, and as I explain below, I have considerable doubt that New York's highest court would follow the majority's reasoning.

Case 13-3619, Document 259, 10/02/2015, 1611485, Page100 of 113
Case 13-3619, Document 248, 09/17/2015, 1600551, Page4 of 17



**I. Issue One: The Obligation to Rebuild**

As the majority explains, damage to property can be remedied either by paying for the property's lost value or by paying for the property's restoration. Maj. Op. at 26. Because either can place the victim in the same position as before the wrong occurred, *see id.*, New York's courts generally award the lesser of the two. This "lesser of two" principle affords full compensation while encouraging mitigation of loss. *See Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892); *see also Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 539 (2002) (stating that the principle provides a plaintiff with "no more than is reasonably necessary to remedy fully the injury while avoiding uneconomical efforts" (internal quotation marks omitted)).

Applying the "lesser of two" rule to this case, the majority reasons that Plaintiffs are entitled to the lesser of the diminution in value of their leases caused by the property's damage and the amount necessary to repair the property. Maj. Op. at 29. The leases' purported obligation to rebuild, however, complicates this analysis. It causes the diminution in value of Plaintiffs' leases

Case 13-3619, Document 248, 09/17/2015, 1606551, Page5 of 17



(the first measure of compensation) to be significantly impacted by the cost of restoration (the second measure).

A proper calculation of a lease's value must take into account all of its provisions. *E.g.*, *Irv-Ceil Realty Corp. v. State*, 43 A.D.2d 775, 775–76 (3d Dep't 1973). As the majority itself states, a lease's value is "the amount that a buyer would be willing to pay for the right to assume the lessee's rights *and obligations*." Maj. Op. at 28 (emphasis added). The obligation to rebuild would have obviously discouraged any potential purchaser of Plaintiffs' leases after September 11, 2001. Yet the majority instructs the District Court to ignore it when calculating the leases' diminution in value—in the majority's own words, to award compensatory damages based on a "hypothetical" rather than reality. *See id*. at 47–48, 51 n.15. The majority does not challenge Plaintiffs' assertion that they were actually damaged by the obligation to rebuild. Instead, the majority reasons that Plaintiffs "should not receive a higher measure of damages" simply because they contractually agreed in advance to repair the property in the event of damage. *Id.* at 32.

New York's highest court might easily disagree with the majority's conclusion. The majority's reasoning runs contrary to the basic principle—expressed in the "lesser of two" rule—that tort damages aim to restore the injured plaintiff to the position that would have been occupied had the harm not occurred. *See McDougald v. Garber*, 73 N.Y.2d 246, 253–54 (1989). Although the "lesser of two" rule is one of mitigation, *see Hartshorn*, 135 N.Y. at 122, and thus the majority emphasizes that a plaintiff's post-tort choice to repair property, on its own, does not justify awarding replacement costs in excess of market value, *see* Maj. Op. at 31, that is not this case. Plaintiffs could not have mitigated the reduction in value of their leases caused by the contractual obligation to rebuild. New York has a long history of permitting tort damages based on contractual losses. *E.g.*, *Steitz v. Gifford*, 280 N.Y. 15, 18–22 (1939) (holding defendant responsible for reduced revenue on crop sold by plaintiff farmer after defendant's negligent driving incapacitated plaintiff, causing a delay in crop's sale). And in at least one case, a New York court has allowed a tort victim to seek damages greater than the value of destroyed property based on the terms of a lease agreement. *See Plouffe v. Rogers*, 144 A.D.2d 218, 219–20 (3d Dep't 1988)

(permitting damage claim for early termination charges on an automobile's lease after negligently caused crash). Hence, there is considerable reason to think that the New York Court of Appeals would, rather than preclude consideration of Plaintiffs' obligation to rebuild as a matter of law, instead permit a jury to consider whether the obligation fits within the scope of proximate cause.

**II. Issue Two: The World Trade Center's Public Value**

Even if Plaintiffs' purported obligation to rebuild were ignored in calculating the diminution in value of their leases—as the majority holds—Plaintiffs might alternatively merit compensation for rebuilding based on the World Trade Center's public value. Plaintiffs, supported by a trio of experts and an amicus brief on behalf of the State of New York, assert that the World Trade Center is worth more to the public (and thus to its government owner) than both what it cost to build and what it would be worth to a potential private purchaser—in other words, that the World Trade Center's public value is greater than both its replacement cost and its market value. Accepting this uncontroverted claim as true—as we must in assessing Defendants' motion for summary judgment—Plaintiffs' rebuilding obligation serves the public interest

and is economically beneficial. The majority nonetheless determines that the New York Court of Appeals would preclude consideration of the World Trade Center's public value in determining Plaintiffs' compensation. I cannot reach the same conclusion with any degree of confidence.

The World Trade Center was built for the public benefit, *see* N.Y. Unconsol. Law §§ 6601(9), 6610; *Courtesy Sandwich Shop, Inc. v. Port of N.Y. Auth.*, 12 N.Y.2d 379, 388–89, *appeal dismissed*, 375 U.S. 78 (1963), and the Port Authority retains ownership of the World Trade Center pursuant to the site's authorizing legislation, *see* N.Y. Unconsol. Law § 6603. The decision to lease portions of the World Trade Center to Plaintiffs was intended to "maximiz[e] the value of the World Trade Center to the Port Authority and to the people of the region," Joint App'x at 377 (Mins. of the Port Auth. Bd. of Comm'rs, Apr. 26, 2001), and New York courts have recognized the public purpose of projects involving leases of public property to private parties, *e.g.*, *Murphy v. Erie County*, 28 N.Y.2d 80, 87 (1971).

Although the New York Court of Appeals has not addressed the valuation of tortiously damaged public property, it would be consistent with New York's

basic principles of tort law to consider the World Trade Center's public value in determining the damages a tortfeasor owes for its destruction. As noted above, the purpose of tort recovery under New York law is "to have the wrongdoer make the victim whole." *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007). Even though an owner of damaged property can typically be made whole by compensation for the property's diminution in market value, market value may provide inadequate compensation for damage to property built and owned by the government; such property might have a utility to the public—particularly a site-specific utility—that exceeds the property's commercial worth.

Hence, whereas the "lesser of two" rule compares a property's market value to its replacement cost for determining full compensation to an owner of private property, full compensation to a government owner of public property might require consideration of the property's public value—essentially, the "lesser of two" of *public* value and replacement cost. For example, a tree in a public park might cost $5,000 to plant, have a value to the public in its location of $10,000, and yet increase the park's market value by only $300. If the tree were negligently cut down, replanting would not constitute waste, and the

government would be made whole by compensation of $5,000, not $300.[2] This is the calculus that Plaintiffs' experts assert applies to the World Trade Center: that its market value is less than its replacement cost, which, in turn, is less than its value to the public.

These considerations could lead the New York Court of Appeals to conclude that the tortious destruction of property built and owned by the government merits a compensatory award of replacement costs where the property's value to the public exceeds its costs of restoration, regardless of its market value. Indeed, in different contexts, New York courts permit compensation based on replacement cost—in excess of lost market value—where market value provides an inadequate measure of loss. *E.g.*, *Lake v. Dye*, 232 N.Y. 209, 214 (1921) (household goods); *cf. Matter of Rochester Urban Renewal Agency*

[2] A variation of this hypothetical is included in Professor Dobbs's treatise on remedies. *See* 1 Dan B. Dobbs, *Law of Remedies* § 1.9, at 46–47 (2d ed. 1993). In Professor Dobbs's version, the tree is on privately-owned land. Although paying for the tree's replacement "is not inefficient" and "may add to efficiency in providing appropriate deterrence," Professor Dobbs cautions against measuring the defendant's liability by the public's loss where the property is privately owned. *Id*. at 46. "The answer is different," writes Professor Dobbs, "when it comes to public resources" in which the public has a right that may be pursued by the government. *Id.* at 47.

*(Patchen Post)*, 45 N.Y.2d 1, 8–9 (1978) (compensation for government taking of "specialty" property, which might be worth to its owner "everything it cost to construct and more" yet lacks a buyer "willing to purchase it even at its reproduction value").

Under the majority's reasoning, however, Defendants are responsible for much less: simply the reduction in value of Plaintiffs' leases without consideration of the substantial costs of rebuilding. Defendants might conceivably be liable to the World Trade Center's government owner for rebuilding costs, except that the Port Authority can receive assistance with rebuilding from Plaintiffs pursuant to their rebuilding obligation, which "served to protect the extensive public investment in the [World Trade Center]." Brief for Amicus Curiae State of New York ("N.Y. Amicus Br.") at 21. The Port Authority is "not presently seeking damages" from Defendants "so long as" Plaintiffs "continue[] to comply" with their contractual obligations. Joint App'x at 589 (Decl. of Keith E. Harris, Chief of the Commercial Litig. Div. of the Port Authority, Aug. 11, 2008). The result is a windfall for Defendants, as they must

pay for much less than the full scope of damage caused by their alleged tort, while Plaintiffs may be compelled to fund the World Trade Center's rebuilding.

I am not convinced that the New York Court of Appeals would accept this result. It has, for many years, applied equitable principles to permit recovery against a wrongdoer by a party that was "compelled to pay the damages which the wrongdoer should have paid." *Dunn v. Uvalde Asphalt Paving Co.*, 175 N.Y. 214, 217 (1903). The equitable doctrine of subrogation, for instance, in the context of insurance, "entitles an insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *N. Star Reinsurance Corp. v. Cont'l Ins. Co.*, 82 N.Y.2d 281, 294 (1993). The New York Court of Appeals has explained, in reasoning that could easily apply here, that subrogation "allocates responsibility for the loss to the person who in equity and good conscience ought to pay it, in the interest of avoiding absolution of a wrongdoer from liability simply because the insured had the foresight to procure insurance coverage." *Id.*; *see also Teichman by Teichman v. Cmty. Hosp. of W. Suffolk*, 87 N.Y.2d 514, 521 (1996) (stating that the "right of subrogation" was "formulated to prevent unjust

Case 13-3619, Document 248, 09/17/2015, 1600551, Page13 of 17



enrichment" and "is based upon principles of equity and natural justice" (internal quotation marks omitted)); *Pittsburgh-Westmoreland Coal Co. v. Kerr*, 220 N.Y. 137, 140 (1917) ("The doctrine of subrogation is a device to promote justice."). The New York Court of Appeals has repeatedly emphasized that the equitable principles of subrogation should be applied broadly where warranted. *E.g.*, *3105 Grand Corp. v. City of New York*, 288 N.Y. 178, 182 (1942) (subrogation "is a highly favored remedy" and "courts are inclined to extend rather than restrict its application"); *Ocean Accident & Guarantee Corp. v. Hooker Electrochemical Co.*, 240 N.Y. 37, 47 (1925) (asserting that the "principle of subrogation ought to be liberally applied for the protection of those who are its natural beneficiaries").

The majority asserts that Plaintiffs cannot recover for the public's loss because they did not serve as the public's "trustee," Maj. Op. at 37, but the majority does not address the possibility that Plaintiffs may nonetheless warrant compensation based on a rebuilding obligation that "served to protect" the public's investment. N.Y. Amicus Br. at 21. Instead, the majority cites *United States v. 564.54 Acres of Land*, 441 U.S. 506 (1979), to note that the Supreme Court

has, in determining "just compensation" for purposes of the Takings Clause, refused to compensate private plaintiffs for the community value of their properties. *See* Maj. Op. at 37. Yet *564.54 Acres of Land* is hardly instructive in predicting how New York's highest court would resolve the issues presented here. It addressed the power of eminent domain (and thus discussed the constitutional limits of "just compensation," not what a tortfeasor ought to pay), it has not once been cited by a published decision of New York's courts, and, unlike here, it involved a private entity that was "under no legal or factual obligation to replace" the taken property or compensate the public for its reconstruction, 441 U.S. at 515. Contrary to the majority's point, moreover, the New York Court of Appeals has explicitly considered public value in determining just compensation for a government taking of private property. *See Matter of Port Auth. Trans-Hudson Corp. (Hudson Rapid Tubes Corp.)*, 20 N.Y.2d 457, 465, 468–70 (1967) (holding that private owner of rail lines and tunnels taken by Port Authority was entitled to more than property's market value, which was scrap, because property formed "an essential part of an essential public facility"), *cert. denied*, 390 U.S. 1002 (1968).

* * *

New York's courts have not addressed the issues discussed above, and I do not believe that we can confidently predict how the New York Court of Appeals would resolve them. The issues are complex, their resolution requires significant public policy choices, and their import to New York State is evident—significant enough, in fact, to warrant the submission of an unsolicited amicus brief on its behalf in this case. Leases frequently include an obligation to rebuild, and New York's amicus brief explains that "[m]any public projects are implemented through long-term leases to private parties." N.Y. Amicus Br. at 3. The State emphasizes its "strong interest in avoiding misclassification of public property as merely private in nature, and in preventing the mistaken construction of New York law to provide an incentive for private parties to abandon their contractual rebuilding and restoration obligations to public entities." *Id.* at 35.

Certification can delay resolution of a specific case, but as the Supreme Court has noted, "[i]t does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Bros. v.*

*Schein*, 416 U.S. 386, 391 (1974). Deciding an undetermined question of state law rather than certifying the question to the state's highest court impedes the development of state law and exposes litigants to the risk that our conjectures on state law are wrong. *E.g.*, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318 (1991) (rejecting our holding on an open question of New York law after we declined to certify). The New York Court of Appeals has underscored "the great value in New York's certification procedure" and affirmed that certification "facilitat[es] the orderly development and fair application of the law and prevent[s] the need for speculation." *Tunick v. Safir*, 94 N.Y.2d 709, 711–12 (2000). The New York Court of Appeals might decline to answer our certified questions, although it does so rarely. *See id.* at 712. But by declining to certify at all, we deny it the opportunity to resolve, in the first instance, novel questions of state law rife with public policy implications.

The State of New York's amicus brief in this case explicitly requests, in the alternative, that we certify this case to the New York Court of Appeals. N.Y. Amicus Br. at 36 n.11. I would grant that request, as I find that the issues of New York law raised here are best addressed by certification. *See* N.Y. Comp. Codes

Case 13-3619, Document 248, 09/17/2015, 1600351, Page17 of 17



R. & Regs. tit. 22, § 500.27(a); 2d Cir. Local R. 27.2; *see also In re Santiago-Monteverde*, 747 F.3d 153, 158 (2d Cir. 2014) (stating general requirements for certification).